## THE STATE v. GEORGE HORN, Appellant.

### Division Two, June 11, 1907.

1. **INFORMATION: First Degree Murder.** Information, set out in the statement, *held* sufficient to charge first degree murder.

2. **DYING DECLARATION: Inadmissible Statements.** It was error to admit in evidence, as a part of the dying declaration of deceased, his statement that "Medlock wanted me to go down to arrest George Horn [the defendant] who was drunk and crazy; and he ran his family off from the house. I went down; I went to Medlock's house first . . . and Medlock said he guessed he wouldn't have him arrested." It was also error to admit in evidence a question propounded to deceased, and his answer thereto, as follows: "Q. He fired at you then? A. Yes, sir. Q. And you fired in self-defense? A. Yes, sir." These statements were but conclusions of the deceased, were inadmissible, and were calculated to damage the defendant.

3. **INSTRUCTION: Singling Out Particular Facts: Ignoring Defendant's Rights: Request to Leave Premises.** It was error to

give an instruction which singled out particular acts of the deceased and gave them undue prominence before the jury, especially since under the general instructions the jury were authorized to consider all the facts. The instruction was erroneous for the further reason that it ignored the right of defendant to request deceased to leave his premises, and ignored the uncontradicted testimony that he did request deceased to leave his premises.

4. **STATEMENTS OF DECEASED: Not Res Gestae.** It was error to admit in evidence a statement of deceased, made after the difficulty occurred, "that he did not know what would become of his poor children." Such statement was not a part of the *res gestae*, and was incompetent for any purpose.

5. **MANSLAUGHTER:** Instruction Favorable to Defendant. Where defendant has asked and obtained an instruction on manslaughter, he can not complain of an instruction on that subject, given by the court, which, if erroneous, is more favorable to him than he is entitled to.

Appeal from St. Francois Circuit Court.—*Hon. Chas. A. Killian,* Judge.

REVERSED AND REMANDED.

*Jerry B. Burks* and *W. S. Anthony* for appellant.

(1) The information does not charge murder. In fact, it wholly fails to charge that Francis Burns, or any other person, for that matter, died from the wounds received at the hands of defendant, George Horn. This is an essential averment, and cannot be dispensed with nor supplied by intendment or implication. State v. Blan, 69 Mo. 321; State v. Hagan, 164 Mo. 654; State v. Sides, 64 Mo. 383; State v. Pemberton, 30 Mo. 376; State v. Wilson, 172 Mo. 423; Kelley's Crim. Law, sec. 474. (2) The court erred in admitting the dying declaration of Francis Burns. No sufficient foundation was laid to warrant the introduction of said statement; and because it did not purport on its face to be a free and voluntary statement of deceased. On

the contrary, it was obtained and drawn out by a series of leading questions, all of which indicated the nature of the answer desired. State v. Partlow, 90 Mo. 608. (3) The court unquestionably committed serious error in giving instruction 7, at the instance of counsel for the State, for the following reasons: 1. Because it singles out a special fact and makes the whole case turn upon it. 2. It tells the jury that deceased had the right to resist or act, not only as an individual, but as constable or officer as well, when as a matter of fact, he was at no time acting as an officer; his dying statement shows this to be the fact, and the court had, in its instruction 14, so declared. 3. It denies the right of a man to defend his home and person against trespassers, and against those seeking to commit a felony upon persons or property, and makes him a murderer if he does so. 4. It makes defendant guilty of murder in the first degree, if the jury finds that Burns was not a trespasser in going on the premises of defendant, regardless of what he did while on the premises. State v. Rutherford, 152 Mo. 133; State v. Mathews, 148 Mo. 185; State v. Taylor, 143 Mo. 150; State v. Hill, 69 Mo. 451; State v. Gartrell, 171 Mo. 516; State v. Clayton, 100 Mo. 521. (4) The court committed error in permitting Mrs. Bennett to testify that Burns stated in the yard of defendant, after the shooting, that he did not know what would become of his poor children. It was no part of the *res gestae* and was wholly incompetent for any purpose. State v. Hendricks, 172 Mo. 672. (5) Instruction 4, on manslaughter, given on motion of the court, does not state the law correctly and was necessarily contradictory to other instructions given by the court on manslaughter in the fourth degree. It is unintelligible and necessarily had a tendency to divert the minds of the jury from the true issues in the cause.

*Herbert S. Hadley,* Attorney-General, *N. T. Gentry,* Assistant Attorney-General, and *George M. Wilson* for respondent.

(1) The amended information, which was accompanied by the affidavit of the prosecuting attorney, is sufficient in form and substance. State v. Hudspeth, 150 Mo. 19; State v. Worton, 139 Mo. 532. (2) (a) Defendant's counsel objected to State's witness Mrs. Bennett testifying that, immediately after the shooting, the deceased called for help; that she told him she could not help him, but she could get some one who could; and that the deceased said he was going to die, and did not know what would become of his poor children. This evidence was clearly a part of the *res gestae,* as the conversation was immediately after the shooting; it was an expression of pain, and an opinion that the deceased could not recover, and was, therefore, admissible. State v. Martin, 124 Mo. 514; State v. Hudspeth, 150 Mo. 26; State v. Talbert, 41 S. C. 530; 1 Wharton's Law of Evid., sec. 259. (b) Defendant's counsel further objected to the dying declarations, which were offered and read in evidence by the State. But by reading all of the testimony of the witness Alexander on the surroundings and statements of the deceased, relative to his having given up all hope of recovery, it will be seen that said declarations were properly admitted. State v. Kilgore, 70 Mo. 551; State v. Parker, 172 Mo. 191; State v. Turlington, 102 Mo. 656; 1 Greenl. on Evidence, sec. 158; 2 Wigmore on Evidence, secs. 1438-1441; 1 Elliott on Evidence, sec. 349; Underhill on Crim. Ev., sec. 103; Whart. Crim. Ev., sec. 276. (3) Instruction 7, asked by the State, is not subject to the defendant's criticisms, but correctly defines the law on the subject of deceased's right to be on defendant's premises. It is the counterpart of defendant's instruction 13, which the court gave at de-

fendant's request. If one of said instructions is erroneous, then both are erroneous; and the error in one off-sets the error in the other, in which event defendant is not entitled to a reversal. State v. Sykes, 191 Mo. 82.

FOX, P. J.—This cause is brought to this court by appeal on the part of the defendant from a judgment of the circuit court of St. Francois county, convicting him of murder of the first degree. The conviction and judgment in this case rest upon an amended information filed by the prosecuting attorney of St. Francois county, which was duly verified. Omitting formal parts, it was as follows:

"Now at this day comes George M. Wilson, prosecuting attorney within and for the county of St. Francois and State of Missouri, leave of court having been first had and obtained, and files this, his first amended information.

"Now at this day comes George M. Wilson, prosecuting attorney within and for the county of St. Francois, and State of Missouri, upon his oath of office, and upon his knowledge, information and belief, and informs the court that George Horn, late of the county aforesaid and State aforesaid, on the 4th day of September, A. D. 1905, at and in the county of St. Francois and State of Missouri, with force and arms, in and upon one James Francis Burns, in the peace of the State, then and there being, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did make an assault; and that the said George Horn, with a certain dangerous and deadly weapon, to-wit, a revolving pistol, then and there loaded with gunpowder and leaden balls, which he, the said George Horn, in his hand then and there had and held at and against him, the said James Francis Burns, then and

there feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought did shoot off, discharge and with the revolving pistol aforesaid, and with the gunpowder and leaden balls aforesaid, then and there feloniously, wilfully, deliberately, premeditatedly on purpose and of his malice aforethought, did shoot, strike, penetrate and wound him, the said James Francis Burns, in and upon the body of him, the said James Francis Burns, then and there with the dangerous and deadly weapon, to-wit, the revolving pistol aforesaid and the gunpowder aforesaid and the leaden balls aforesaid, giving to him, the said James Francis Burns, in and upon the body of him, the said James Francis Burns, one mortal wound, of which said mortal wound aforesaid, he, the said James Francis Burns, from the fourth day of September, A. D. 1905, until the twenty-third day of September, A. D. 1905, in the county of St. Francois and State of Missouri, and the city of St. Louis and State of Missouri, did languish and languishing did live, on which said twenty-third day of September, A. D. 1905, in the city of St. Louis, and State of Missouri, of the mortal wound aforesaid, then and there did die.

"And so George M. Wilson, prosecuting attorney aforesaid, on behalf of the county and State aforesaid, upon his oath of office aforesaid, and upon his knowledge, information and belief, aforesaid, does inform the court that the said George Horn, him the said James Francis Burns, in the county of St. Francois and State of Missouri, in the manner and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did kill and murder, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State."

To this information there was a plea of not guilty and the defendant, at the May term, 1906, was put upon his trial. We shall not undertake to detail all of the evidence developed at the trial of this cause. It is sufficient, in order to enable us to determine the legal propositions presented, to indicate what the testimony developed at the trial tended to prove.

The testimony on the part of the State tended to show that on the afternoon of September 4, 1905, there was a picnic at Elvins, about one mile from Flat River, and that Francis Burns was at the picnic, and that witness Carl Norwine told the deceased, who was constable of St. Francois township, that defendant's wife, Mrs. George Horn, wanted him to come over to the house and take charge of George and take him to Farmington until he got sober. After having this conversation with Norwine the deceased went to the house of Mr. Medlock, the son-in-law of the defendant, and Medlock accompanied the deceased over to the house of the defendant. On arriving at the house of the defendant the deceased and Medlock found the defendant sitting on a couch in the front room, conversing with a neighbor, Mrs. L. A. Hunt. The defendant at that time was quiet and conducting himself properly. Mrs. Hunt testified that she arrived at Mrs. Horn's home about 3 p. m., September 4, 1905; that she found Mr. Horn sitting or lying on the sofa in the front room, and while she was talking to him Mr. Burns, the deceased, and Mr. Medlock came in and they were received in a friendly way. Mrs. Hunt further testified as follows: "I asked Mr. Burns why he had not united with our church during that conversation, and he said, 'I don't know,' was the words, I believe, and he said he 'wasn't quite satisfied on the communion question,' made that remark. I looked around and there was a Bible lying on the table and I says, 'Here

is a Bible. Let us read something about it.' During the conversation Mr. Horn left the room and came back while we were talking about the meeting and when he come back Mr. Medlock says, 'I will go after the ladies,' and I says, 'No, don't go, I am going home.' He got up and left the room and that left Mr. Horn, Mr. Burns and myself, and I was looking at the scriptures. Q. You were reading the scriptures. Did you read it there? A. No, sir; I didn't read it. I was looking for the scriptures and while Mr. Medlock was gone Mr. Horn and Mr. Burns got up and left the room. Q. What door did they get out of? A. Went out of the room door that goes into the hall. Q. Do you know who went out first? A. No, sir; I couldn't tell you which one went out first because I was looking at the book and didn't think about them and wasn't paying any attention to what they was saying or the conversation between them. Q. Did you hear any conversation about going out? A. I didn't catch the words. I heard nothing about what they were saying to each other. I didn't catch any of the words at all. Q. Did you hear any suggestion in the room? A. No, sir; I didn't. Q. Then what transpired, Mrs. Hunt? A. While they was gone out a short time I had looked over my Bible, I had found the chapter — 11th chapter, First Corinthians — and had the Bible in my lap, and I heard talking out of doors and I got up and stepped into the hall and I looked out of the front door that fronts on Taylor avenue and I saw Mr. Horn standing not far from the corner of the porch. Q. Yes, sir? A. He was standing with his hand dropped down and a revolver in his hand. Q. Where was Burns, if you saw him? A. I didn't see him after he left the room."

Mrs. Victoria Bennett, a witness for the State, testified substantially as follows:

"Well, I heard Mr. Burns say that he come there

to make peace, and didn't come to have any trouble; that he come to make peace. 'Let's settle this business now.' Horn told him, 'It is settled. I wish you would get out of here.' Burns kept talking kind and coming to him — wanted to 'settle this matter and make peace.' Mr. Horn kept telling him it was already settled, for him to get out, to go outside. He kept backing off from him and Mr. Burns kept crowding up to Mr. Horn and he kept backing off, and he kept backing down — backing down until he got to the front gate. When he, Horn, got to the front gate it looked to me like he come around to the front side of the house and Mr. Horn swore for him to get outside or he would kill him. I saw Horn with a gun in his hand, and Burns says, 'If that is the case, I have got one too,' and he took a pistol out of his pocket, and drawed a pistol at each other, and Mr. Burns looked like he got kind of mad and they got to talking and they dropped their pistols down to the side, and I didn't see any pistol for a while. Directly they raised their pistols and fired. Q. Who fired first? A. I am not very positive, but I think Mr. Horn fired the first shot."

Witness further testified, over the objection and exception of defendant, that Burns, while lying in the yard of defendant after the shooting, stated that deceased cried and said he "did not know what would become of his poor children."

### Cross-Examination.

Q. During the conversation you say that Horn commenced backing down by the end of the house? A. Yes, sir.

Q. Away from Burns? A. Yes, sir.

Q. Did Burns say anything about arresting him? A. No, sir; not that I heard.

Q. Nothing said about it? A. No, sir.

Q. He just wanted to make peace? A. Yes, sir.

Q. Now during that conversation was Burns still following Horn up? A. Yes, sir.

Q. Horn was backing away from him? A. Yes, sir.

Q. Did they have pistols in their hands at that time? A. I didn't see any at that time.

Q. You don't know whether they had them in their hands or not? A. They might have had them for all I know. I don't know.

Q. How far did Horn back away from Burns? A. He kept backing until he backed down to the front gate.

Q. As they were going back there wasn't Horn telling him to get out of the yard? A. Yes, sir.

Q. What was Burns doing? A. He told him he didn't come for trouble, he come to make peace. 'Let's talk this matter over,' he says, 'and make peace.'

Q. He wouldn't get out? A. He didn't get out.

Q. He could have gone out of the gate where you were —. A. Yes, sir.

Q. While Horn was going around the house? A. Yes, sir.

Q. When they got down next to the fence you say Horn turned around? A. Yes, sir.

Q. Didn't he go around a peach tree? A. A peach tree or flower bush, yes, sir.

Q. Why didn't Burns go out of the front gate? A. I don't know. I never asked him.

Q. Didn't he start around towards Horn again? A. Yes, sir.

Q. And Horn swore if he wouldn't get out he would shoot him? A. Burns kept coming just the same.

Q. He kept coming just the same? A. Yes, sir.

Q. Then you discovered them with pistols? A. Yes, sir.

Q. You say they raised their pistols —? A. Yes, sir.

Q. Then dropped them to their side? A. Yes, sir.

Q. Didn't Horn again tell him to get out of the yard? A. Yes, sir.

Q. And he didn't go? A. No, sir.

Q. You don't know who fired the first shot, though? A. I think Horn fired the first shot.

Mrs. Margaret Tyson, on behalf of the State, testified as follows:

Q. What attracted your attention over there first? A. I heard some one quarreling, somebody fussing. I didn't understand it, though.

Q. You didn't understand it? A. No, sir.

Q. Next you say you saw the shooting? A. Yes, sir, the shooting.

Q. Was there any interval between the times of this shooting at all? A. Sir?

Q. Was there any space of time elapsed between the shots? A. No, sir; as soon as the shooting started.

Q. It was rapid, was it? The shooting was quick? A. Awfully quick. Five shots were fired.

Joseph Alexander, introduced by the State, was an uncle of the deceased and testified concerning the statement read in evidence as the dying declaration of the deceased, over the objections and exceptions of the defendant. The statement containing the dying declarations of the deceased was read in evidence. It was as follows:

Q. Do you realize, Mr. Burns, you are in the presence of death and that you have no hopes of living? A. Yes, sir.

Q. Do you know you are about to meet your Maker? A. Yes, sir.

Q. Your name in full is James F. Burns? A. Yes, sir.

Q.   Where do you live?   A.   Flat River.

Q.   What was your position in Flat River?   A. I was constable.

Q.   Of what township?   A.   St. Francois.

Q.   Just state in your own way as briefly as you can how this trouble occurred?   A.   Well, a fellow came after me —

Q.   What is his name?   A.   Carl Norwine; I was up in Elvins and William Medlock wanted me to go down to arrest George Horn, who was drunk and crazy; and he ran his family off from the house.   I went down; I went to Medlock's house first; we went down to Medlock's brother-in-law, Covington.

Q.   What did you find there?   A.   And Medlock he said he guessed he wouldn't have him arrested; he did not have no warrant anyway.

Q.   Where did you find Horn?   A.   Found him at his own house.

Q.   What occurred there?   A.   We went in and sat down a little bit and Medlock says, "Well," he says, "I will go down and get the folks and bring them up—"

Q.   What did Horn do?   A.   Horn still sat there.

Q.   Where was he sitting?   A.   He was sitting on the sofa.

Q.   What were the first words between you and Horn?   A.   After Medlock left he called me out and asked me if Medlock didn't bring me up there to investigate that trouble.   I says, "No;" "Yes," he says, "He has and God damn him I am going to kill him." "Now," I says, "Look here, George, I wouldn't do anything like that."   I says, "Let's talk this over."   I says, "Let's talk it over."   He says, "I don't want to talk with you at all," and he grabbed his pistol and I couldn't say which one shot first.

Q.   Did you see him draw his pistol?   A.   Yes, sir.

Q. Did you have your pistol drawn at that time? A. No, sir.

Q. You saw him draw his pistol before you got yours? A. Yes, sir.

Q. Then when you saw him draw his pistol and raise it in a threatening manner, you drew your own? A. Yes, sir.

Q. You say you cannot tell who fired first? A. Cannot tell who fired first.

Q. And you are sure you saw him draw his pistol and cock it before you attempted to draw your pistol? A. Yes, sir.

Q. He fired at you then? A. Yes, sir.

Q. And you fired in self-defense? A. Yes, sir.

Q. How many shots did he fire? A. I couldn't say.

Q. You were struck by one of his shots? A. One of his shots.

Q. This gun was in the hands of George Horn? A. Yes, sir.

Q. That was in St. Francois county, Missouri? A. St. Francois township, St. Francois county, Missouri.

Q. You realize, as I said at first, you make this statement with the knowledge that death is impending? A. Yes, sir.

Q. Did you ever previous to this time have any trouble with Horn personally? A. No, sir.

There were other witnesses introduced by the State, but their testimony does not materially conflict with the testimony as hereinbefore indicated; therefore, we deem it unnecessary to reproduce it. The testimony of the State further tended to show that the wound inflicted upon the deceased was fatal and that his death resulted from such wound.

On the part of the defendant the sheriff, James J. Croke, testified concerning the appearance of the re-

volver of the defendant. He stated that only two cartridges had been fired and that two of the chambers had never been used.

The defendant, George Horn, testified in his own behalf, and his testimony was partly as follows:

Q. What is your name? A. George Horn.

Q. You are the defendant in this case? A. Yes, sir.

Q. How old are you, Mr. Horn? A. I will be fifty-four. the sixth day of this month.

Q. You are a son of Joe Horn, the old gentleman here? A. Yes, sir.

Q. Nephew of John Horn? A. Yes, sir.

Q. How long have you lived in this county? A. I have lived here fifty-four years pretty near.

Q. Did you know Francis Burns —? A. Yes, sir.

Q. In his lifetime? A. Yes, sir.

Q. Were you at your home in the afternoon of September 4, 1905—? A. Yes, sir; I was.

Q. When Francis Burns came to your house? A. Yes, sir.

Q. What were you doing when he came in? A. I was sitting in the room talking to Mrs. Hunt when he come in.

Q. How long had Mrs. Hunt been there when he came in? A. Just a few minutes. I don't remember.

Q. Who came in with him? A. William Medlock.

Q. William Medlock. Did they knock at the door? A. I don't remember. I think — I don't think they did. I think they come right on in.

Q. After Mr. Burns came there what happened in the room while Mrs. Hunt was there? A. Well, her and I was talking something about a meeting, protracted meeting going on there—I don't know whether

in a tent — Baptist meeting anyway, whether in church or tent. They come in and spoke just as I gave them chairs and they sat down and the subject went on about the same. They was talking about the meeting.

Q. Well, what was said by Mr. Burns to her in your presence, if you know? A. She asked him about why he didn't come up and join the Baptist church. He said that he didn't agree with the Baptists on close communion. I think that is the way he said.

Q. Then what next happened in the room? A. She says — she was sitting close to the center table. She says, "Here is the Bible. I will explain it to you and show you that we are right."

Q. Well? A. About that time I heard a noise out in the dining room and I had had that pistol in there trying to get the hulls out of it and I thought it was my little grandson in there and I got up and went out and Mr. Burns followed me.

Q. What did he say when you went out, if you remember? A. I picked it up. There was lying in the dining room a small screw driver, about that long (indicating) and a little pair of compasses, and with them I was taking it to pieces. I didn't know how else to get them out, and as I went in I walked past the table and picked them up, all three, and went out of the dining room out on the porch. There is a cistern right here, and there is a walk here to the alley gate, and there was a walk out here to the wood house (indicating), and I always kept it in my tool chest.

Q. You kept it in a tool chest. You say "tool chest," are you a mechanic or carpenter? A. Carpenter.

Q. By trade? Well, go ahead. A. When I went out of this door I saw him come from the hall through this door into the dining room. That was the first that I knew he was coming and I looked out at the cistern — the cistern stands right over here — to see

if the dipper was on top of it, thinking he was coming for a drink of water, and I didn't say anything at all. I walked this way a little, out this walk out here, and about the time I started over here, before I got there, he says, "Put that down" or "drop it." Something to that amount. I thought he was just joking. We was always friends and I thought he was joking at me and I didn't pay any attention to it. Just about the time I turned on that walk, he says, "I tell you to stop," and I stopped and when I turned around he had his pistol. He didn't have it by the handle but had it about the middle of it. He says "Come here," motioning for me to come to him, and I started to go to him and I asked him if he wanted to arrest me and he said he did not. The first time I asked him he didn't answer. The next time he said he didn't. He says, "I don't want to arrest you," but he kept telling me to come to him. He looked like he was excited and I asked him what was the matter and he just kept motioning this way (indicating). He says "You come here," motioning this way with his pistol, and I suppose I got as close as this table to him and I thought he was going to hit me over the head with the pistol, and I says, "Burns, I ain't coming any closer." He says, "I don't want to arrest you. I want to talk to you." I says, "I can hear you."

Q. What further was said? A. When I said that he stepped a few steps towards me and I stepped a few steps back. I was on the walk that runs out to the alley gate and he was on the walk that goes to the cistern.

Q. That was in the back yard? A. Yes, sir. I stepped down off of the walk into the yard here and I says, "Burns, I don't want you to hit me with a pistol," he says, "I don't want to arrest you. I want to talk with you and make peace with you." I says, "Burns, we were always friends. There is no peace

to make," and I says, "I want you to get out of the yard. I ain't going to let you hit me." I kept backing around this way thinking to get into the front door and get into the house. When I got about half ways he come down the walk and I got along at the end of the house and he got between me and the front door. When I come along here nearest the house I just backed off a little down this way closer to the fence, away from the house. Of course I was excited. I says, "Go away until you are at yourself and not excited and come back here and I will talk to you all day." And he says, "I will do it." I started then back — I was about twenty feet from the house, and I started back to the back part around the house. He was between me and the front door and close to the walk. I don't know whether on the walk or not, but when I started back he started to follow me again. He was right at the gate. I says, "Burns, don't follow me any more." I says, "I have run all over the yard from you and I ain't going to run any further."

Q. What position was he in when you shot him?
A. Of course, when I stepped up to the bay window, that throwed the corner of the house between me and him, and he left the gate and come up fifteen feet in the yard and a little closer to the end of the house and the fence and where he could see me, and he threw his gun up that way again and when I seen him do that I throwed my gun right up this way and fired.

Q. What position was his pistol in when you shot him? A. Had it right up to my head.

Q. Pointed at you? A. Yes, sir.

Q. Do you know how many shots he fired, Mr. Horn? A. No, sir, I don't know. I think four. I wouldn't say positively.

Q. Do you know how many you fired? A. Yes, sir.

Q. How many? A. I shot one.

Q. How do you know that, Mr. Horn? A. I know I only fired one, and I know there was only two in the gun.

The testimony in this case also shows that the defendant was seriously wounded by shots fired by the deceased during this difficulty. The first bullet fired by the deceased at the defendant burned the defendant as it glanced across his wrist and entered the side of the house; another shot fired by the deceased at the defendant wounded the defendant in the left side of the stomach, the ball passing out the right side of the stomach. The defendant, after being arrested, was taken to the Sanitarium at Farmington, where his wounds were treated. There was other testimony tending to show that two bullet holes were found in the side of the house near the southeast corner and near where the defendant was standing at the time of the shooting.

This is a sufficient statement of the nature and character of the testimony upon which this cause was submitted to the jury. At the close of the evidence the court instructed the jury upon murder of the first and second degrees, manslaughter in the fourth degree, and upon self-defense, credibility of witnesses, presumption of innocence and reasonable doubt, and upon other subjects to which the testimony was applicable. We will give due consideration to the objections to the admissibility of testimony as well as the challenge to the correctness of the instructions during the course of the opinion. The cause was submitted to the jury upon the testimony as introduced upon the trial and the instructions of the court and they returned a verdict finding the defendant guilty of murder of the first degree. Timely motions for new trial and in arrest of judgment were filed and by the court overruled. Sentence and judgment followed in conformity to the

verdict, and from this judgment the defendant in proper form and due time prosecuted his appeal to this court, and the record is now before us for consideration.

## OPINION.

The record before us discloses numerous assignments of error as a basis for the reversal of the judgment in this cause. We will give such consideration to the complaints of appellant as their importance and the importance of the case requires.

## I.

The sufficiency of the information upon which this judgment is predicated is challenged. We have carefully considered this information and analyzed the allegations contained in it and it is sufficient to say upon this question that in our opinion, while the form of the charge may be subject to some criticism, it substantially charges every essential element necessary to constitute the offense of murder of the first degree, and fully informed the defendant of the nature and cause of the accusation against him; therefore, the ruling upon this assignment of error must be adverse to the appellant.

## II.

It is next insisted that the court erred in admitting the dying declarations of Francis Burns. This subject has frequently had the attention of this court and it is not out of place to say that there is no subject applicable to the rules of evidence that has received more careful consideration than the one relating to the admission of dying declarations in evidence. The uniform expressions of this court in a long line of well-considered cases has been that this character of testimony ought to be admitted with appropriate care and

should be received with great caution. The rule as applicable to this class of testimony has been so firmly established in our jurisprudence that it is hardly necessary to cite authority upon the subject. In Smith v. State, 9 Humph. l. c. 17, the rule was thus clearly and forcibly announced as applicable to this subject. TURLEY, J., speaking for the court, said: "Testimony of this character is only admitted from necessity, and an abuse of it is guarded against by the law with most minute particularity." This court, in State v. Johnson, 118 Mo. l. c. 502, quoted approvingly what was said by BYLES, J., wherein this rule was announced and the reasons clearly set forth upon which it is predicated, that "dying declarations ought to be admitted with scrupulous, and, I had almost said, with superstitious, care. They have not necessarily the sanction of an oath; they are made in the absence of the prisoner; the person making them is not subject to cross-examination, and is in no peril of prosecution for perjury."

If we are to heed the admonition of the court as indicated in the clear announcement of the rules applicable to this subject, as herein indicated, and undertake with minute particularity to guard against an abuse of the rule applicable to the admission of dying declarations in evidence, we see no escape from the conclusion that at least a part of the statements made by the deceased and admitted in evidence as dying declarations were inadmissible. The statments to which we allude as being clearly incompetent and inadmissible were as follows:

"Q. Just state in your own way as briefly as you can how this trouble occurred? A. Well, a fellow came after me —

"Q. What is his name. A. Carl Norwine; I was up in Elvins and William Medlock wanted me to go down to arrest George Horn, who was drunk and crazy;

and he ran his family off from the house. I went down; I went to Medlock's house first; we went down to Medlock's brother-in-law, Covington.

"Q. What did you find there? A. And Medlock he said he guessed he wouldn't have him arrested; he didn't have no warrant anyway."

That such statements as made by the deceased as dying declarations are inadmissible, in our opinion, is too plain for discussion. Such statements are but a conclusion presumptively drawn from what Norwine or Medlock told him as to the condition of the defendant and as to his improper conduct. Equally objectionable is the question propounded to and answered by the deceased when making his dying declarations in which he was asked: "Q. He fired at you then? A. Yes, sir. Q. And you fired in self-defense? A. Yes, sir."

While the deceased in a dying declaration might detail anything that occurred, it was no part of his province to determine by the doing of a particular act that he did it in self-defense. That statement was a mere conclusion and should have been excluded. The conclusion reached as to the admissibility of the portion of the dying declarations herein indicated is fully supported in the case of State v. Elkins, 101 Mo. l. c. 350, 351. This court, speaking through Judge BLACK, after ruling that a sufficient showing had been made as to the condition of the deceased at the time of making the dying declarations to render them admissible, said: "The difficulty, however, arises over the answer of the witness to the question propounded by the State on re-examination. The deceased is here made to say: Defendant 'picked a fuss with me, and was running over me, and, because I did not want him to, he killed me.' This statement covers and includes all that transpired in the house and thereafter up to the time defendant shot. It is the only evidence introduced by

the State as to what transpired in the house. It is not
a narration of facts, and was not designed as such
by the declarant, but it is a statement by the deceased
of his conclusions as to the whole matter. The declara-
tions of a deceased person are admissible only as to
those things to which he could testify, if sworn in the
cause, and he should state facts and not conclusions.
Now, we are aware that such general conclusions often
drop from a witness, and, when they are made by a
witness on a witness stand so that there may be a full
examination and cross-examination, they seldom fur-
nish a ground for a reversal of a judgment. But here
the witness, who is speaking, could not be examined or
cross-examined, and his conclusions as to what trans-
pired in the house are not accompanied with a state-
ment of the facts. All of the facts covered by these
conclusions of the deceased were susceptible of narra-
tion. The evidence elicited by the State on re-exam-
ination should have been excluded, that is to say, that
part of it last quoted. It was for the jury, and not
the witness, to draw conclusions."

As to what weight or influence this incompetent
testimony in the nature of a dying declaration had
upon the jury, we are unable to say, and in a case where
the results are of such a serious character we are un-
willing to indulge in a guess or surmise as to the in-
fluence such improper statements had upon the jury
in reaching their verdict; at least we are unwilling to
say that the statements as made by the deceased as a
part of his dying declaration, that William Medlock
wanted him to go down to arrest George Horn who
was drunk and crazy, and who had run his family off
from the house, were entirely ignored by the jury,
and if we were permitted to indulge in surmises, we
would be inclined to say that this testimony was cal-
culated to damage the defendant in the trial of this
cause. Emphasizing the error of the admission of this

portion of the dying declaration of the deceased, it is practically conceded that the deceased did not go to the house and premises of the defendant as an officer, or that he was in any way acting in his official capacity. The trial court who heard all of the testimony relating to the action and conduct of the deceased, plainly instructed the jury that "the deceased, Francis Burns, while at the house and on the premises of the defendant at the time of the difficulty, was not there in the capacity of an officer, nor performing any duty pertaining to his office, and in determining the guilt or innocence of the defendant, you should disregard the fact that deceased was at such time constable of St. Francois township." The admission of those portions of the dying declarations as herein indicated was manifestly erroneous and they should have been promptly excluded.

### III.

Learned counsel for appellant complain of the action of the court in giving instruction 7. This instruction was as follows:

"The court instructs the jury that if you believe and find from the evidence that the defendant, just prior to and at the time of the alleged homicide, was attempting, without just cause or provocation, to assault the deceased with a pistol, and that deceased had good reason to believe and did believe that defendant was about to kill him, or to do him some great bodily harm, then, and in that event, deceased, either as an individual or as a constable or officer, had the right to resist said assault and defend himself, and did not have to leave the premises of defendant in order to do so, notwithstanding you may believe and find from the evidence that the premises belonged to defendant, and that defendant was at the time ordering and did order deceased to leave the premises, provided you find that deceased rightfully and peaceably entered upon said defendant's premises."

To the giving of which said instruction defendant by his counsel objected and excepted at the time and before said instruction was read to the jury.

It is sufficient to say of this instruction that in our opinion it has no place in the trial of this cause and should not have been given. In the first place, the deceased was not upon trial, and under the other general instructions in the case it was the province of the jury to fully consider his acts and conduct and determine whether or not such acts and conduct were of such a character as afforded any justification on the part of the defendant to take his life. Therefore, it was error to single out particular acts and conduct of the deceased and give them undue prominence before the jury. Particularly is this true in view of the fact that the jury under the general instructions applicable to the difficulty were fully authorized to consider all the facts in the case. This instruction is also erroneous for the further reason that it ignores the right of the defendant to request the deceased to leave his premises and further ignores the fact that, as is shown by the uncontradicted testimony, he did request the deceased to leave his premises, and if the deceased, as is practically conceded in this case, was not there in his official capacity, the instruction is also erroneous in ignoring any reference as to what should have been the action of the deceased under those circumstances when requested to leave the premises. It also ignores the fact that the defendant had the right to request the deceased to leave his premises, whether he entered upon them peaceably or wrongfully. Now, while it is not to be understood as the opinion of this court that the defendant had the right to kill the deceased because he requested him to leave his premises and he refused such request, we simply indicate that the fact that he had a right to make such request and that it was the duty of the deceased to heed it, are absolutely ignored in the instruc-

tion now under consideration. It is unnecessary to pursue this subject further. We simply repeat that the instructions of the court which required that the defendant should be justified in killing the deceased before he was entitled to be acquitted, fully submitted to the jury for their consideration every act done by the deceased and as to whether or not his acts furnished any justification on the part of the defendant for taking his life.

### IV.

It is next insisted that the court erroneously admitted in evidence by the witness Mrs. Bennett, a statement of the deceased after the shooting occurred, "that he did not know what would become of his poor children."

This was a statement made by the deceased after the difficulty was over and was no part of the *res gestae;* it had no tendency to prove or disprove any of the issues presented in this trial, and was wholly incompetent for any purpose, and was simply calculated to inflame the minds of the jury, and should have been excluded by the court.

### V.

Finally, it is insisted that the court erred in giving instruction 4 on manslaughter in the fourth degree. Upon this grade of the offense the court gave two instructions, one of them instruction 13, requested by the defendant, of which it necessarily follows there can be no complaint. Instruction 4 was as follows:

"The court instructs the jury that if you believe and find from the evidence in this cause that at the county of St. Francois and State of Missouri, at any time within three years before the 2nd day of November, A. D. 1905, James Francis Burns approached the defendant in a threatening manner and assumed an attitude which gave the defendant good reason to believe, and that he did believe, that the said James Fran-

cis Burns was then and there about to assault him with a revolver and strike him with the same, but not under such circumstances as to justify the defendant on the ground of self-defense as defined in these instructions, and that such assault by said Burns provoked on the part of the defendant a sudden heat of passion, and that while still in such heat of passion and before the blood had time to cool defendant shot the said Burns, giving the said James Francis Burns a mortal wound, from which said mortal wound the said James Francis Burns within one year thereafter, at the city of St. Louis and State of Missouri, died, then you will find the defendant guilty of manslaughter in the fourth degree and assess his punishment at imprisonment in the penitentiary for a term of two years, or at imprisonment in the county jail for a term not less than six months nor more than twelve months, or at a fine of not less than five hundred dollars or at both a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months nor more than twelve months.''

It is sufficient to say of this instruction that while it may be subject to some criticism in its recitation of the facts upon which is based the arousing of the sudden heat of passion on the part of the defendant, yet we take it that as appellant was given an instruction upon that grade of the crime in a form requested by him, and as instruction 4; if in any way erroneous, is more favorable to the defendant than he was entitled to under the uniform rulings of this court, he is in no position to complain of that instruction.

We have thus indicated our views upon the main propositions disclosed by the record before us. It is unnecessary to say that this is a serious case. The result of the trial in the lower court was a judgment inflicting the highest penalty known to the law, that of death, and a judgment so serious in its results can only

be justified after a fair and impartial trial free from any substantial error. That the deceased, James Francis Burns, did not go upon the premises of the defendant with the avowed purpose and intention of doing him any personal injury, we are of the opinion the testimony fully shows. However, it must not be overlooked that the deceased, according to the testimony and the instructions of the court, was not in the discharge of any official duty, but simply acting as a plain, ordinary citizen, and that this difficulty occurred upon the premises of the defendant, respecting which the law guarantees to him certain rights. We are unwilling to say that the penalty of death should be inflicted upon the defendant until every element of the offense of murder of the first degree has been established in a trial which, at least, is free from substantial error affecting his rights. Hence the conclusion follows that the ends of justice would be best subserved by awarding the appellant a new trial in which the errors herein indicated may be avoided. It follows, therefore, that the judgment of the trial court should be reversed and the cause remanded, and it is so ordered.

All concur.