THE STATE v. N. A. STRAWTHER, Appellant.—116 S. W. (2d) 133.

Division Two, May 3, 1938.

*W. G. Bray* and *Ward & Reeves* for appellant.

*Roy McKittrick,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

LEEDY, P. J.—The appellant, N. A. Strawther, and his two sons, Joe and Woodrow, were jointly charged by information in

the Circuit Court of Dunklin County with murder in the first degree, in having shot and killed one Arch Shrum. An application for a change of venue was sustained, and the case was transferred to the Stoddard Circuit Court, where a severance was ordered, and appellant placed upon his separate trial. He was found guilty of manslaughter, and sentenced to a term of ten years in the penitentiary, and he appeals.

The sufficiency of the evidence is not challenged. The alleged homicide grew out of a boundary dispute between Joe and Woodrow Strawther, sons of appellant, and Arch Shrum, the deceased. The Strawther boys, as tenants, farmed 80 acres of land in Dunklin County. Shrum, the deceased, was tenant on a tract immediately adjoining on the south. A controversy arose between them as to whether one row of Shrum's cotton was not over the line on the Strawther boys. It appears that the Strawther boys had plowed up the offending row, and on May 29, 1935, Shrum had caused the same to be replanted. On the afternoon of that day a difficulty ensued wherein Shrum challenged the Strawther boys to fight. At that time an unsuccessful effort was made to locate a corner post or stob. Appellant was not present at that time, but the next morning the fact of the difficulty was communicated to him by his sons, as well as an alleged threat by Shrum to kill his said sons. The three Strawthers then went to Kennett to see the owner of the land in an effort to get the boundary line established. They were given some figures and a plat of the land and advised to measure the land and establish the line and see if they could get a satisfactory settlement with Shrum. That afternoon measurements were made in accordance with the data furnished by the owner of the land, and a stob was set marking the corner. An encounter ensued between appellant and his sons on the one hand and Glen Nugent, an employee of Shrum on the other, in which Nugent and Joe Strawther exchanged blows. Olivett Shrum, the deceased's daughter, was preparing to take Nugent to Senath to see a doctor on account of a cut he had received on the head. She testified that Joe Strawther threatened that they would go to the field where Arch Shrum was working, and "get" him. The evidence on the part of the State tended to show that Olivett Shrum followed them, and that their car did stop in the road about 100 feet from where her father was working in the field: that "after Olivett Shrum got out of the car she saw the Strawthers and her father, the deceased. Her father was running southeast toward Mattic's place and the Strawthers were pursuing him. The witness took the pistol out of her purse and started running toward her father. The appellant was running in front and was passed by Joe Strawther who overtook Shrum and tripped him, causing him to fall. Woodrow Strawther had a doublebarreled shot gun. The

appellant had a gun. When Joe tripped Shrum he caught him around the arms and Woodrow held him by the feet. Shrum was held on the ground on his stomach with his head toward the ground. While Shrum was in that position the appellant placed the pistol at a point on his back and fired. Witness Olivett was within about ten steps of her father at the time this happened. After the shot was fired Joe Strawther said, 'Damn it, if you hadn't come over here this never would have happened.' After the shot was fired Olivett gave the gun to her father who slipped it under him. She begged them not to shoot the second time and no more shooting occurred.''

Appellant's version of the fatal encounter was after the difficulty in which Glen Nugent was injured, he (appellant) and his two sons started down the highway to a field where Arch Shrum was plowing for the purpose of seeing if the boundary line, according to the measurements they had taken, would be satisfactory. Joe got out of the car, and called to Shrum, and told him they had measured the ground and had come to make an agreement about it, to which Shrum replied, ''All right.'' Then Joe stepped over the fence inside the field, and when he did so Shrum looked around and started running toward his daughter, who had a gun in her hand, and was running to her father. Joe then started running toward Olivett and shouted to her, ''Olivett, don't give him the gun. I am not going to hurt him.'' However, the girl continued to run toward her father. Whereupon appellant says he reached in the pocket of the car, got his gun, and ''put my gun in my pocket and jumped out and jumped the fence and started down the fence after my boy, Joe . . . in order to protect him . . . I run right on after him, following him up and as I run Mr. Shrum beat Joe to the girl something like 10 or 12 feet and when he got to the girl he grabbed his pistol and said, ''Give me the gun, I am going to kill the G— d— s— o— b—,' and he drawed the gun on Joe.'' That Shrum had the gun in his right hand, and ''Arch was trying to get the gun up where he could shoot him, and as I run I hollered three times, 'Don't shoot, Arch. Don't shoot, Arch.'' And when I hollered the third time I was in about six feet of him, and when I hollered that time he stuck this—Joe was stooping over his shoulder and he stuck the gun against him and said, 'I am going to kill the s— o— b—.' and I grabbed my pistol and fired one shot . . . to save the life of my son.'' The Strawthers then loaded Shrum into their car and took him to the doctor at Senath, who in turn caused him to be taken to a hospital at Paragould, Ark., where he died as a result of the gunshot wound. Other facts, if deemed pertinent, will be stated in the course of the opinion in connection with the points to which they relate.

I. The first contention is that the court erred in overruling the plea in abatement. The ground of that plea was that although defendants had been accorded a preliminary examination, and were bound over without bail, no copy of the testimony which had been "taken down in writing" was "furnished these defendants and no copy accompanied their commitment." The statute in that behalf (Sec. 3489, R. S. 1929, Sec. 3489, Mo. Stat. Ann., p. 3118) provides: ". . . where the prisoner is committed to jail, the examination of himself and of the witnesses for or against him, duly certified, shall accompany the warrant of commitment, and be delivered therewith to the jailer." To sustain its plea, it appears that defendant merely offered "all of the files in this case together with a certificate of the clerk of the Circuit Court of Dunklin County" and rested. The bill of exceptions then recites: "The affidavit for state warrant, information and other file papers in this case constitute the record proper and will be certified to this court by the clerk in the transcript herein, and to which reference is here made, and there is nothing in the file papers showing the certified copy of the evidence in the preliminary was ever served upon the defendant." On the part of the State it was shown that the preliminary was held on June 18, 1935; that the testimony of the witnesses was taken in shorthand and later transcribed; that the following stipulation was entered into at the preliminary: "It is agreed by and between counsel for the state and the defendants that the witnesses may sign their testimony at any subsequent date before the date of the trial in Circuit Court." It further appeared that on June 24 the transcript of the testimony was delivered to the jailer, who at that time was holding defendant under the commitment issued by the examining magistrate. The transcript bears the following endorsement: "Filed June 24, 1935—Birt P. Bryant, Circuit Clerk." After delivery thereof to the jailer, the transcript remained in his custody and with the commitment. It is stated in the bill of exceptions that the witnesses signed the transcript of their respective examinations, but the record is silent as to the date or dates thereof. On this showing the court's ruling that appellant had waived the requirements of the statute would have to be sustained. [State v. Smith (Mo.), 228 S. W. 1057.] But that is not all; the State developed other pertinent facts. It placed on the stand one of appellant's attorneys, who testified that on or about June 24, through his co-counsel, he obtained a copy of the transcript from the stenographer who reported the preliminary; that it was used in evidence by appellant on the hearings of his several applications for *habeas corpus* to fix bond before trial, which hearings were held successively in the circuit court, the Springfield Court of Appeals, and in this court. We think it fairly inferable that all such hearings were before the change

of venue was taken, which was August 7, the transcript being lodged in the Stoddard Circuit Court on August 12. It was not until September 3, the day on which the case was set for trial and heard on the merits, that the plea in abatement was filed. At the trial the transcript of the testimony of the witnesses before the preliminary was used by appellant for the purpose of cross-examination. There is no contention with respect to the correctness of the testimony as transcribed and signed. These facts bring the case within the rule announced in State v. Ancell, 333 Mo. 26, 62 S. W. (2d) 443, State v. McDaniel, 336 Mo. 656, 80 S. W. (2d) 185, and the recent case of State v. Banton, 342 Mo. 45, 111 S. W. (2d) 516. The action of the circuit court in overruling the plea is, accordingly, approved.

II. The point is made that the court erred in admitting the alleged dying declaration of Shrum because no proper or sufficient foundation was laid for its introduction, in that it was not shown that, at the time of the making thereof, the declarant had abandoned all hope of recovery, and believed that his death was imminent. It is hardly necessary to cite authorities in support of the proposition "that a dying declaration, to be admissible in evidence as such, must have been made by the declarant *in extremis,* and in the belief of impending death after hope of recovery had been abandoned." [State v. Flinn (Mo.), 96 S. W. (2d) 506.] Proof of the facts and circumstances attending the making of the declaration in question was such as to admittedly bring it within the above rule, unless, as appellant contends, a statement of declarant, testified to by his brother, "If I ever get well, I am going to let the law take its course," is sufficient to show deceased had not, at that time, abandoned all hope of recovery.

In State v. Barnes (Mo.), 204 S. W. 264, where the declarant made the statement that he was going to try his best to get well, it was held, "This would not prove that he entertained such hope of recovery as would make his declaration incompetent," citing State v. Vest, 254 Mo. 458, 162 S. W. 615, State v. Parker, 172 Mo. 191,' 72 S. W. 650.

However, the disposition of this assignment need not rest upon the authority of that case alone. It will be recalled the shooting occurred about five o'clock P. M., May 30. Shrum was taken immediately to the town of Senath, where he was attended by a local physician, whose testimony shows: "He was in pain for one thing . . . and I looked at him and he had a hole in his back, and I made an examination and gave him a shot of morphine to ease him, and put a first aid dressing on him, and took him to the hospital." The bullet entered "about a half inch to the left of his spine in the middle of the shoulder blade of the back . . . hit the spine and ran downward." An operation was performed at the

Paragould (Ark.) hospital, and the bullet removed "from the eighth intercostal space at the nipple line right below the heart."

The alleged dying declaration was made at the hospital mentioned on the following Sunday, June, 2, and Shrum died June 9. The statement was made in the presence of several witnesses. The prosecuting attorney of Dunklin County was present at the bedside, and it appears from the testimony that in obtaining the statement of declarant, part of the time the prosecuting attorney asked questions and "part of the time Mr. Shrum just made a statement, and Mr. Ford wrote it down." It was abundantly shown that Shrum, some ten or fifteen minutes before his statement was taken, had been informed by his physician, in the presence of others, that "there wasn't any chance on earth for him" and that Shrum replied, "I believe you" or "I believe so;" and "realized he was going to die and didn't hold out any hopes of recovery." Moreover, the declaration itself states in terms that the declarant does not expect to recover, the precise language being: "I, A. A. Shrum, realizing that I cannot live and I must die within a short time. . . ."

It is true that deceased's brother, at the hearing out of the presence of the jury, testified to the statement to the effect that if he got well, he was going to let the law take its course; but it is by no means clear that such statement was made at the time of, or in connection with the written declaration admitted in evidence. The witness seems to have been confused as to the exact time of that utterance, and contradicted himself, saying at one time that it was several hours before the written declaration, and at another that it was made at the time the written declaration was made. Upon being recalled, his testimony was clarified, so that the trial court was satisfied, and the record warrants the finding, that the utterance complained of was made two or three hours before the written statement was prepared. In this connection it may be said that the several witnesses present when the alleged dying declaration was made heard no such statement. In view of the foregoing, we are of the opinion that no error was committed in admitting the alleged dying declaration.

It is contended that the court committed reversible error in admitting the following parts of said declaration, over the objection that they were "mere opinions and conclusions and were hearsay and not a part of the *res gestae*:" "I turned to run to Mr. R. M. Mattic's farm for help;" "They all three chased me;" "I begged them not to kill me before my daughter;" "My daughter was crying and begging them not to shoot me any more;" "I begged them to take me to a doctor;" "I had no gun when they came in the field, did not even have a pocketknife with me;" "I did not try to shoot either one of them either before or after they shot me;" "I did not try to hit or strike either of them but was trying to get to Mr. Mattic's house."

The rule restricting the subject matter of dying declarations "to the identification of the accused, the act of killing, and the circumstances immediately attending the act, forming a part of the *res gestae*" is the same in this jurisdiction as in practically all of the states. [State v. Parker, supra, State v. Wilks, 278 Mo. 481, 213 S. W. 118; State v. Peak, 292 Mo. 249, 237 S. W. 466; State v. Matthews, 111 S. W. (2d) 62.] But "matters of opinion in dying declarations are inadmissible, except where they would be received if the declarant himself were a witness." [Underhill's Criminal Evidence (4 Ed.), sec. 217, pp. 389-390.] In State v. Horn, 204 Mo. 528, 103 S. W. 69, chiefly relied on by appellant, the following question was propounded to and answered by the deceased when making his dying declaration, "And you fired in self-defense? A. Yes, sir." In holding the same to be a mere conclusion, and, therefore, inadmissible, the court said, "While the deceased in a dying declaration might detail anything that occurred, it was no part of his province to determine by the doing of a particular act that he did it in self-defense." That case cites approvingly, and quotes at length from State v. Elkins, 101 Mo. 344, 14 S. W. 116, wherein the statement that the accused "picked a fuss with me, and was running over me, and, because I did not want him to, he killed me" was held to be "not a narration of the facts, and was not designed as such by the declarant, but is a statement by the deceased of his conclusions as to the whole matter." That case is also authority for the proposition that "The declarations of a deceased person are admissible only as to those things to which he could testify, if sworn in the cause, *and he should state facts and not conclusions.*" (Italics, the present writer's.) But what constitutes an opinion and what constitutes a statement of fact is a matter upon which the courts "are decidedly not in harmony." [25 A. L. R., p. 1377, note.] For the purpose of determining that question it is proper to take into consideration not only the statement itself, but the surrounding circumstances. [State v. Wilks, supra.]

Looking to the first statement complained of, "I turned to run to Mr. R. M. Mattic's farm *for help,*" it appears that appellants complaint is limited to the italicized words "for help." We observe that in his brief he concedes "There was a sharp conflict in the testimony as to why the deceased was running immediately before the killing." Now, in this situation, would the statement complained of be competent evidence if the declarant were on the witness stand? "Circumstances immediately surrounding the killing are, of course, admissible . . . and especially so where, as here, a question is whether defendant had reasonable cause to expect great bodily harm from the deceased." [State v. Elkins, supra.] In State v. Brown, 188 Mo. 451, 87 S. W. 519, the dying declaration contained this clause, "As he arose from the table he was reaching in his pocket

for his revolver." This was held to be not a mere statement of a conclusion, but a statement of fact. And in State v. Moore (Mo.), 80 S. W. (2d) 128, the complaint was with respect to permitting a witness, the cashier of a robbed bank, to state that the accused placed him in fear of bodily injury by the use of a pistol. This court said: "We do not agree with the appellant that this is a mere conclusion, but we think it is a fact showing the witness' mental attitude." It is competent for a declarant to tell what he was doing at the time of the homicide, and we are of the opinion that, as the statement relates to declarant's *own* act, and narrates a relevant fact within the *res gestae* of the killing, it was properly received. For like reasons, we hold the other portions assailed do not offend against the rule excluding matters of opinion, and, accordingly, over-rule appellant's contention.

III. This brings us to a consideration of the assignment charging error in the giving of Instruction No. 11, which reads as follows: "The Court instructs the jury that, if you find that the defendant killed the deceased, then the burden of proving circumstances of mitigation or justification, if not shown by the testimony offered by the State, is upon the defendant, but if, after careful consideration and comparison of the evidence and circumstances in the whole case, you have a reasonable doubt as to whether or not defendant killed deceased in the lawful defense of his son, J. E. Strawther, as explained and defined in the other instruction herein, you should find the defendant not guilty." The criticism of this instruction is that it erroneously puts the burden of proof on the issue of mitigating circumstances or justification upon the defendant, is self-contradictory, and, therefore, confusing and misleading.

In the comparatively recent case of State v. Malone, 327 Mo. 1217, 39 S. W. (2d) 786, this court in an opinion by Cooley, C., exhaustively reviewed the subject of burden of proof in a criminal case. There the charge was murder and self-defense was relied on as a defense. The trial court gave an instruction which placed upon the defendant the burden of proving to the satisfaction of the jury that he acted in self-defense, and, substantially like the present instruction, concluded by telling the jury that, "if upon the full consideration of all the testimony you have a reasonable doubt of defendant's guilt, you should acquit the defendant." The giving of this instruction was held to constitute reversible error. The first part of the instruction in question does expressly tell the jury that the "burden of proving circumstances of mitigation or justification, if not shown by the testimony offered by the State, is upon the defendant." But the State argues that this has no reference to the burden of proof, but that "this language can only be understood to

mean that the *burden of producing evidence* of mitigation or justification shifted to appellant," and that, when read and considered in connection with Instruction No. 5 (a stock form on presumption of innocence and reasonable doubt) the instruction properly declared the law and fully protected appellant's rights. The State seeks to justify the giving of the instruction upon the authority of such cases as State v. Jones, 78 Mo. 278, l. c. 285, wherein it was said: "When the State proves that a defendant did the killing, with a deadly weapon, this, without more, under our rulings, makes out a prima facie case of murder in the second degree, and any matter of *excuse, justification or extenuation of the offense, rests with the accused.*" (Italics ours.) Whatever doubt may have existed as to the meaning of the italicized portion of the foregoing was very definitely settled by the Malone case, when it was said: "If the language we have italicized is understood to mean only that the defendant must then offer evidence to repel the presumption if he would escape its effect, we think it states the law; but if that language be regarded as a holding that the *burden of proof thereupon shifts to the defendant,* and as justifying an instruction to the jury to that effect, we disapprove it." In that same connection it was further said: "It is true that where the State's evidence shows a killing by the use of a deadly weapon upon a vital part of the body, nothing else appearing, murder in the second degree, from the necessities of the situation, will be presumed, unless evidence is offered to repel that presumption. If in such case a defendant would escape the effect of that presumption, he must come forward with some evidence. The 'burden of evidence' or the necessity of offering evidence may thus shift during the trial. But the burden of establishing defendant's guilt rests with the State, does not shift, and when the proof is all in the final question for the jury is, Are all essential averments of the indictment proved beyond a reasonable doubt? [See State v. Howell, 100 Mo. 628, 663 et seq., 14 S. W. 4, discussing the defense of alibi; State v. Hudspeth, supra.]'"

While it is true that the language of this instruction is not as strong as that in the one condemned in the Malone case, it is nevertheless, subject to the same criticisms, and for the same reasons. Apart from the fundamental error of shifting the burden of proof to defendant, the instruction in the Malone case was also held bad because it was confusing. In that connection, this court said: "A lawyer might work out a construction to reconcile and harmonize that positive direction (that the burden of proving that he acted in self-defense was on defendant) with the concluding sentence and the presumption of innocence to which defendant was entitled, but it is not likely a jury of laymen could do so. To say the best of it, the instruction was likely to be misunderstood by, and to mislead

the jury." And such is our view of the instruction in the instant case. Moreover, the giving of the instruction was unauthorized, even under the State's own construction of it, i. e., that it dealt only with the matter of the burden of evidence, as distinguished from the burden of proof. This because "The shifting of the burden of evidence is governed by rules of procedure which are designed solely for the guidance of the court; with respect to their observance, operation, or effect, the jury has no function to perform." [State ex rel. Stevens v. Arnolds et al., 326 Mo. 32, 30 S. W. (2d) 1015; Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S. W. 1043.]

Other complaints of error relating to the giving and refusing of instructions, and the admission and exclusion of testimony have been briefed. However, they are of such nature as to render it unlikely that they will recur on another trial, and for that reason we will not further lengthen this opinion. For the error pointed out in the giving of Instruction No. 11, the judgment is reversed and the cause remanded.

All concur.