# THE STATE v. VIRGIL WILKS, Appellant.

## Division Two, June 3, 1919.

1. **DYING DECLARATION: Introduction: Preliminary Examination.**
   It is a universal rule that a trial court must determine, in the
   absence of the jury, the preliminary question whether or not the
   purported dying declaration is admissible. In determining this
   preliminary question the court must take into consideration the
   statement itself and the surrounding circumstances, for the pur-
   pose of ascertaining whether it was made under proper conditions
   and whether it is of a character which will render it admissible.

2. ———: **Matter Admissible: Conclusion.** Statements claimed to be
   dying declarations are admissible only as to such matters as the
   declarant might himself testify to were he alive and sworn as a
   witness. Therefore, a statement of declarant which is a mere con-
   clusion or the expression of an opinion is always incompetent.

3. ———: **Received With Caution.** Courts invariably receive pur-
   ported dying declarations with great caution, because of the ab-
   sence of an opporunity to cross-examine declarant.

4. ———: **"Virgil Killed Me:" Conclusion or Fact? Context: Cir-
   cumstances.** A declaration by deceased after he was shot and
   shortly before he died that "Virgil killed me," standing alone,
   might be a statement of fact or an expression of opinion; there-
   fore, the context and the words intimately connected with those
   words, especially if they explain them, and the entire circum-
   stances under which they were used, are admissible, if the words
   themselves are.

5. ———: **Detaching Context: Contradicted by Further Declaration.**
   Where declarant, having been shot by an unseen person through
   the window of his bed-room, shortly before he died said to his
   wife: "You go away from me. Virgil killed me. You and him
   made it up this afternoon to kill me to-night. They tried to get
   me when I was on the porch," it was improper to detach the words
   "Virgil killed me" from their context and admit them alone,
   but all the words should have been admitted or all excluded, since
   the context explains the three words admitted. And if the whole
   statement or any part of it is admitted, a further declaration
   made by declarant to his brother that "Charley Wilks shot me,
   and Virgil and Bill hired him to do it" was admissible to contra-
   dict the previous statement made by declarant to his wife, since
   it explains it and throws light on what was in his mind at the
   time he made it.
   278 Mo.—31

6. ———: Shot by Unseen Person: Identification of Assailant: Conclusion. If the declaration as to the identity of his assailant is an expression of opinion drawn from facts immediately under declarant's observation, it is admissible; but if the opinion is the result of a course of reasoning from collateral facts, it is inadmissible. In any event, the declaration must be restricted to the identification of the assailant, the act of killing and the circumstances immediately attending the act. So where deceased was shot between 7:20 and 7:30 on the evening of November 21st, there was a lighted lamp in the room, and between him and his assailant was a glass window, a lace curtain and a wire screen, it is apparent that he could not have seen through these obstructions and recognized one standing far enough away to point a gun and fire through the window; and this being true and there being nothing in the declaration itself indicating that he saw his assailant or saw anything to indicate who he was, a declaration made by him shortly before his death that "Virgil killed me" was an expression of an opinion, a mere conclusion, and inadmissible, and its admission reversible error.

Appeal from Lawrence Circuit Court.—*Hon Charles L. Henson,* Judge.

REVERSED AND REMANDED.

*William B. Skinner* and *Patterson & Page* for appellant.

(1) The court erred in refusing to exclude the testimony of Cora Knott as to the alleged dying declaration of deceased. Dying declarations are limited to the circumstance of the killing and by whom; they cannot include what went before or a separate and disconnected fact (with the act of killing) nor can they include an expression of opinion or belief, but are confined to statement of fact. In all cases it is for the court to pass upon the question of the competency of the statements and to the jury can only be left the degree of credit such declarations are entitled to, the same as any other item of evidence submitted for their consideration. 1 Bishop on Criminal Evidence, 1207, 1216; 1 Greenleaf, 156; Sherwood, pp. 836-838; Kelley (3d Ed.), par. 278; State v. Simon, 50 Mo. 370; State v. Draper, 65 Mo. 335;

State v. Chambers, 87 Mo. 408; State v. Parker, 172 Mo. 191; State v. Spivey, 191 Mo. 110; State v. Zorn, 202 Mo. 12; State v. Crane, 209 Mo. 328; State v. McCannon, 51 Mo. 160; State v. Vansant, 80 Mo. 76; State v. Elkins, 101 Mo. 344; State v. Brown, 188 Mo. 460; State v. Minor, 193 Mo. 613; State v. Horn, 204 Mo. 528. (2) The propriety of the admission of dying declarations is a preliminary question for the determination of the court before they are allowed to go to the jury. Wharton on Criminal Evidence (9 Ed.), sec. 297; 4 Ency. Evidence, 947; State v. Simon, 50 Mo. 375; State v. Johnson, 118 Mo. 504; State v. Zorn, 202 Mo. 32; State v. Crone, 209 Mo. 328; State v. Johnson, 118 Mo. 502; Lipscomb v. State, 75 Miss. 559. (3) The utmost caution should be exercised by the court in the admission of dying declarations, and the tendency of the courts is to greater stringency, rather than to any relaxation of the rules which permit the admission of this kind of evidence. 4 Ency. Evidence, p. 945. (4) Declaration must be complete to be admissible. 4 Ency. Evidence, p. 985; State v. Johnson, 118 Mo. 491. (5) Failure of witness to hear all that deceased said renders the declaration inadmissible. 4 Ency. Evidence, p. 986. (6) Only such statements are competent as would be competent if deceased were living and on the witness stand. 4 Ency. Evidence, p. 991; State v. Reed, 137 Mo. 135. (7) A mere expression of opinion or belief by a dying man is not admissible as a dying declaration, and it is immaterial whether the fact that the declaration is a mere statement of opinion appear from the declaration itself or from other undisputed evidence showing that it was impossible for declarant to have known as a fact what he stated. 4 Ency. Evidence, p. 993; State v. Elkins, 101 Mo. 350; State v. Parker, 96 Mo. 382; State v. Chambers, 87 Mo. 406. (8) The question whether a declaration is opinion or conclusion of deceased is a question for the court. 4 Ency. Evidence, p. 993; State v. Williams, 67 N. C. 12; Binns v. State, 46 Ind. 311; McBride v. People, 5 Colo. App. 91; State v. Hays, 78 Mo. 318; State v. Johnson, 118 Mo. 503.

*Frank W. McAllister,* Attorney-General, and *Thomas J. Cole,* Assistant Attorney-General, for repondent.

(1)    The statement of George Wilks that "Virgil killed me" was admissible as a dying declaration. State v. Rider, 90 Mo. 62; State v. Dipley, 242 Mo. 477; State v. Morgan, 1 Mo. App. 25, 28; State v. Evans, 124 Mo. 408; State v. Bradley, 34 S. C. 136; State v. Mace, 118 N. C. 1245; Smith v. State, 183 Ala. 23; Baker v. State, 187 S. W. 95; State v. Quick, 15 Rich. (S. C.) 349.    (2) The fact that dying declarations are inconsistent with each other does not preclude them, but bears only on their weight as evidence.    Moore v. State, 12 Ala. 764; Richards v. State, 82 Wis. 179; White v. State, 30 Tex. App. 655; Comonwealth v. Turner, 224 Mass. 236; 21 Cyc. 991.

WHITE, C.—The defendant on a trial in the Circuit Court of Lawrence County was found guilty of murder in the first degree.  He was charged with having killed his father, George Wilks.  From that judgment he appealed to this court.

Virgil Wilks was 21 years old at the time of the trial in September, 1918.  There was one previous trial of the case, in which the jury disagreed.  George Wilks was 64 years of age, a farmer, and lived about five miles west of the City of Aurora, and about two miles north of Verona, in Lawrence County. He had a number of children, all of whom had married and left home, with the exception of Virgil.  At the time of his death, November 21, 1917, his family consisted of himself, his wife, Virgil, and a hired boy 17 years of age by the name of Sid Pilkerton.

George Wilks lived in a house, fronting east, consisting of seven rooms. A southeast front room was the sitting-room; just west of that was the dining-room, and then the kitchen.  On the north side of the house was the parlor in the northeast corner, and back of that three bed-rooms occupied the space to the rear of the house.

Two of these bed-rooms opened into the dining-room, and the third one opened into the kitchen. George Wilks occupied the middle bed-room opening into the dining-room. On the evening of his death, November 21, 1917, the family ate supper as usual. Virgil Wilks left the table first, went out and hitched his horse to his buggy, and drove away. Soon after, Mr. Wilks passed from the dining-room into the sitting-room, and read the morning papers, which had arrived by the afternoon mail; Mrs. Wilks washed the dishes, and came into the room where he was; Sid Pilkerton went to bed in the room opening off the kitchen. Wilks, after reading the paper, went through the dining-room into his bed-room. Soon Mrs. Wilks heard the crash of glass, and other people in the neighborhood heard a shot. She and Sid Pilkerton rushed into the dining-room and found Mr. Wilks lying on the floor. He had been shot in the stomach while in the act of undressing in his bed-room, had run into the dining-room, and had fallen there. He had one pants-leg off and one on at the time he was found. He had been shot from outside of the house, through the window of his bed-room; the shot passed through a wire screen, broke the glass of the window, and tore a hole through a lace curtain. There was evidence to show that the shot was fired so close to the window that powder stains were found on the outside of the screen. The time at which the shot was fired was variously stated by the witnesses to be somewhere between 7:20 and 7:30 o'clock. Wilks died about 8:45 from the effect of the wound.

The evidence offered to connect Virgil with the murder of his father showed that in January, 1917, Virgil had left home and gone to Detroit, Michigan, where he remained until June, 1917, when he returned home. He then took charge of his father's farm, under some sort of an arrangement by which he purchased the live-stock. Evidence showed there had been differences between the father and son in regard to feeding the cattle. Charlie Wilks, a nephew of the deceased who

lived a quarter of a mile away, testified that Virgil had mentioned the disagreements with his father and said, "I have had kill in my head here lately."

Wilks was shot with a number-four shot fired from a twelve-gauge gun. A box of cartridges of that size was in the house and some of the shells were missing. Virgil owned a twelve-gauge gun, which had disappeared and was never found after the murder. Virgil claimed it disappeared while he was absent in Detroit and he could not find it on his return home. The tracks of a rubber-tired buggy were shown to have been made from the road leading south, down a wide ditch which led in the direction of the Wilks home, where they turned some distance from the house and led out again. There was some similarity between those buggy and horse tracks to the ones made by the buggy and horse driven by defendant.

The defense was *alibi*. Defendant claimed he drove to Aurora after supper, to visit a girl with whom he was keeping company, by the name of Ethel Ashens. This girl and several other persons testified to seeing the defendant in Aurora about eight o'clock or before. The evidence tended to show that it took about fifty minutes to drive from the Wilks home to Aurora. There was testimony to the effect that Virgil Wilks's horse, on that evening, did not show any evidence of having been over-driven.

The telephone wire was cut in the yard, where it was attached to a tree. Bloodhounds were brought to the scene immediately. They took the trail and pursued it to the house of the nephew, Charley Wilks.

The defendant was informed of his father's injury a short time after he arrived in Aurora; he hurried home in an automobile, arriving there after the death. Nothing in his demeanor at the time indicating guilt is mentioned in the evidence.

The evidence apparently the strongest against the defendant and that which tends most nearly to connect him with the murder was the alleged dying statement of

Wilks. The shot attracted the attention of some of the neighbors, and they were notified of the tragedy and soon began to arrive. Among those who arrived first was Mrs. Cora Knott, who lived about a hundred yards away. A little later W. R. Wilks, or "Doc" Wilks, a brother of the deceased, arrived. After Mrs. Knott arrived she heard the wounded man exclaiming and calling upon the Lord to save him, and among other things he made the statement which was offered and admitted as his dying declaration. Later, when the brother, Doc Wilks, arrived, and the dying man had been placed on his bed, he made a different one to him. This latter statement was introduced by the defendant.

The alleged declaration testified to by Mrs. Knott was this: she heard the deceased say to his wife, "Virgil killed me." That is all that appears in her testimony as to what the statement was. It developed, however, that at the preliminary examination, and again at the previous trial of the case, Mrs. Knott had given the complete statement of the deceased, of which the above words were only a part. His complete declaration to his wife at the time was as follows: "You go away from me; Virgil killed me. You and him made it up this afternoon to kill me tonight. They tried to get me when I was on the porch."

There was no preliminary examination of the witness at the trial to show that such was the complete declaration, but it seems conceded by the State that it was. Before the prosecuting attorney made his opening statement to the jury, Mr. Skinner of the defense objected to any reference to the alleged dying declaration by the prosecutor, setting forth in his objection the complete statement as above quoted, as testified to at the former trial and in the preliminary hearing. The objection was renewed in the same form at the time Mrs. Wilks was called to testify, on the ground that the declaration was a mere conclusion, the expression of opinion or inference, and not the statement of a fact by the witness. The court excluded all the declaration ex-

cept the expression, "Virgil killed me," doubtless on the theory that the rest of it was expressions of opinions or inferences, while the part admitted was the statement of a fact. The defendant, then, on cross-examination of Doc Wilks, had him testify to the declaration heard by him after his arrival; he said George told him he wanted to make a dying statement and said: "Charley Wilks shot me, and Virgil and Bill hired him to do it." Bill was another son living probably somewhere in the neighborhood.

The questions arising on the admissibility of dying declarations have often received the consideration of this court. It is a universal rule that a trial court must determine in the absence of the jury the preliminary question whether or not the declaration offered is admissible. [State v. Finley, 245 Mo. l. c. 474; 1 R. C. L. p. 544.] The court in determining this preliminary question must take into consideration the statement itself and the circumstances surrounding, for the purpose of finding out whether it is made under proper conditions and whether it is of a character which would make it admissible. Such statements are admissible only as to such matters as the declarant might have testified to if sworn as a witness in the case. [State v. Elkins, 101 Mo. l. c. 351; State v. Chambers, 87 Mo. l. c. 408; State v. Horn, 204 Mo. l. c. 549.] Therefore, the statement of the declarant which is a mere conclusion or the expression of an opinion is always incompetent as a dying declaration. [See also, State v. Parker, 172 Mo. l. c. 202, 203; State v. Vansant, 80 Mo. l. c. 76; State v. Minor, 193 Mo. l. c. 613.]

The courts invariably receive such statements with great caution, because of the absence of any opportunity to cross-examine. This court in the case of State v. Elkins, at the page cited, after holding that a dying declaration should be admissible only if it stated facts and not conclusions, said: "Now, we are aware that such general conclusions often drop from a witness, and, when

they are made by a witness on a witness stand so that there may be a full examination and cross-examination, they seldom furnish a ground for a reversal of a judgment. But here the witness, who is speaking, could not be examined or cross-examined, and his conclusions as to what transpired in the house are not accompanied with a statement of the facts.''

In this case the declaration introduced, ''Virgil killed me,'' might be a statement of fact or it might be the expression of an opinion, according to circumstances. It it had been testified to by the declarant as a witness on the stand it could have been elucidated by cross-examination to show which it was. That part of the statement which the trial judge deemed an expression of an opinion he excluded. If the part excluded had been detached in meaning from the part admitted and not directly and intimately related to it and connected with it, there would have been some reason for separating them; but the part excluded and the part admitted were so intimately joined and connected as a single statement that a part of it could not be detached from the rest without changing or modifying its import. The Devil may quote Scripture to serve his purpose by taking it out of its context. It all should be admitted together or excluded together. The part excluded simply explains the part admitted. It gives his reason for saying, ''Virgil killed me,''—''you and he made it up this afternoon to kill me tonight.'' ''They tried to get me when I was on the porch.''

This view is strengthened by what he said a few minutes later to Doc Wilks: ''Charley Wilks shot me and Virgil and Bill hired him to do it.'' Of course, the latter statement, being separate in point of time and made to a different person, was admissible to contradict the first statement, and it throws light on what was in the mind of the deceased at the time he made it.

The court not only should have considered the entire statement, but the entire circumstances. It doesn't matter whether the character of the declaration as an

opinion appears from the statement itself or from evidence which shows the declarant could not have known the fact stated. [State v. Chambers, 87 Mo. 406.] The shot was fired through the window, a lighted lamp was in the room; between the man who was shot and his assailant were a wire screen, a glass window and a lace curtain. It is apparent that he could not see through these obstructions from a lighted room out into the darkness and recognize one standing far enough away from the window to point a gun and fire it. There is nothing in the declaration itself indicating that he saw his assailant or recognized him, or saw anything at the moment to indicate who he was. · Cases have arisen where dying declarations were offered explanatory of murders committed by persons shooting from outside of a lighted house and killing someone inside the house. [State v. Williams and Avery, 67 N. C. l. c. 15-17; Binns v. State, 46 Ind. l. c. 314; Jones v. State, 52 Ark. l. c. 347; Harper v. State, 56 L. R. A. note c, pp. 375-80, in which many cases are cited and the subject discussed at length.]

If a declaration is an expression of an opinion drawn from facts immediately under the observation of the declarant; for instance, if he sees his assailant and from appearances which he may describe he draws a conclusion as to his identity, it is admissible, but if the opinion is the result of a course of reasoning from collateral facts it is inadmissible. The case of State v. Williams and Avery, 67 N. C. 12, is a leading case often cited in elucidation of that principle. The declaration must be restricted to the identification of the assailant and to the act of killing, and the circumstances immediately attending such act. [State v. Parker, 172 Mo. l. c. 202.] Here the declarant didn't base his statement that Virgil killed him on anything he saw at the moment of the act, or anything which came immediately under his observation; but it excludes that idea. The first declaration, showng the feeling of repulsion for his wife, "You go away from me," immediately con-

nected her with it. "Virgil killed me. You and him made it up this afternoon to kill me tonight. *They* tried to get me when I was on the porch." The evidence indicates that before going to bed the deceased stepped out on the porch and saw, or suspected that he saw, someone lurking in the neighborhood. Possibly he saw Virgil. If he did, and drew his inference from that fact, the statement would be inadmissible, because that was not immediately connected with the act of firing the shot. While the statement made to Doc Wilks to the effect that Charlie had shot him and that Virgil and Bill had hired him to do it, would not make the first statement made to his wife incompetent, yet it should have been taken into consideration by the trial court as a part of the circumstances indicating what was in the mind of Wilks in the hour of his death. The natural and obvious interpretation of the declaration that Virgil killed him, taken together with all that he said, with the situation, the shot fired from the darkness outside when the deceased was in a lighted room, and his apparent inability to see through a lace curtain, a glass window and a wire screen, is that he inferred it from other circumstances and conditions, and not from what came immediately upon his observation at the time the shot was fired. It seems impossible that he intended to say that he saw Virgil fire the fatal shot. The evidence was improperly admitted.

The judgment is reversed and the cause remanded. *Railey* and *Mozley, CC.,* concur.

PER CURIAM:—The foregoing opinion by WHITE, C., is adopted as the opinion of the court. All of the judges concur.