The People of the State of New York, Respondent, *v.* Clara Smith, Appellant.

Third Department, June 27, 1935.

*Stanley Bliss* [*Laura A. Willson* of counsel], for the appellant.

*Royal D. Woolsey, District Attorney,* for the respondent.

Hill, P. J. Defendant has been convicted of first degree manslaughter for killing her paramour, Howard Rhoades. He died from a wound in the abdomen made with " a paring knife or other sharp instrument." The indictment charged second degree murder.

Defendant, a married woman living separate from her husband, and Rhoades, a divorced man, occupied living rooms one flight up

from a restaurant which they conducted as partners. A license to sell beer was in Rhoades' name. In the early morning hours after the restaurant had been closed, these parties, while no one was present, disagreed over the division of the money in the till. Each was partially intoxicated. A physical encounter followed the disagreement. The only direct evidence is given by defendant. She recites that numerous blows were given and received and much obscene and profane language used. The scene of the conflict ranged from the barroom and restaurant to the second floor living rooms. Twice the parties were in the living rooms. The termination of the altercation is told by the defendant. " He stood there with his arm back of him and I said, ' Oh, still got the money, eh? ' He said, ' Try and get it, try and get it ' and laughed. I said, ' I will try and get it.' I rushed for it and he pushed me and he had the money back of him, so at last he knocked me down on the floor and he kicked me and choked me. I hollered something ' My God, Howard, you are killing me.' Then he started to run down the stairs and he fell down the front stairs." At some time Rhoades received a bad knife wound in the abdomen, and was taken to the hospital. Defendant was not permitted to see him until some days later when she was asked by a physician and the police to go to the hospital and urge the patient to undergo an operation, which he had refused to do. She went and says that she asked him, " How did this happen? " and that he said, " Clara, when I was up in the bathroom you thought I had the bag of money back of me but I had a knife and when I fell down stairs I stabbed myself. I fell on the knife. Don't you tell. I don't want to tell on account of my license." Shortly before Rhoades died he made a statement which has been received as a dying declaration. Exclusive of inconsequential details, it is as follows:

" On Sunday morning, June 24, 1934, after closing, Clara and I had difficulties with reference to dividing up the money. She took the money from the cash register, but later I got the money from her, and believe I put it behind the bathtub. During the trouble we were upstairs and downstairs more than once. During the time she struck me several times. She was mad when I got the money away from her. At some time during the trouble I was hurt in my side. I do not know just when it occurred. When I last came down the stairs, I either fell part way down or fell after I was down in the front hall. When I awoke or came to, I felt blood on my side and got up and started across the street, intending to go to the hospital. I did not see the knife at any time, but know that I was cut in the side sometime during the trouble. After I crossed the street, the police car came along and took me to the hospital

where I still am and where I am making this statement in the presence of the district attorney; Dr. Brooks, coroner, and others; realizing that my condition is serious and that I may not survive. We both had been drinking more or less and we both had had a hard day and were tired. She was not near me when I came to at the foot of the stairs.

" The doctors have told me that my condition is serious and I am making this statement of facts to the best of my ability, realizing that I may not live and this statement can be used as a dying declaration, because made by me in full realization of my condition.

" There was no good reason for our trouble."

Other evidence was received bearing upon the mental state of the declarant and whether at the time the statement was made he was without hope of recovery and in the shadow of impending death. There is no evidence that he had been told there was no hope of recovery, or of statements by him to a like effect or of circumstances showing his preparation for death. To sustain the admission of the statement the district attorney relies particularly upon the testimony of a physician who was present when the statement was made. " I recall some time during that conversation we called his attention to the fact that he had been told by his physician that he was desperately ill and might not live and from his appearance and his actions I believe he was fighting — I believe he knew he was not going to live." I have searched in vain for authority to sustain the relevancy of expert testimony upon the subject of a state of mind under the circumstances here shown. The trial judge must determine, not only from the conversation of the declarant but from the surrounding circumstances, that there is clear proof showing the certainty of speedy death and that the declarant had no hope of recovery. (*People* v. *Ludkowitz*, 266 N. Y. 233, 239.) The verification of the declaration added nothing to its competency. Dying declarations are admissible in evidence upon the theory that the declarant, impressed with the awesome thought of approaching certain dissolution, will be urged to tell the truth with all the compulsion that would be felt after a solemn appeal to the Creator in an oath. (*People* v. *Sarzano*, 212 N. Y. 231.) The declarations must have been made in the consciousness of a swift and certain doom. " Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be ' a settled hopeless expectation ' * * * that death is near at hand, and what is said must have been spoken in the hush of its impending presence." (*Shepard* v. *United States*, 290 U. S. 96, 100.) Measured by these requirements, the statement received in evidence was not a dying declaration. Its receipt as such was prejudicial

error. The district attorney in his brief argues for the admissibility of the declaration upon another ground. " The declaration is admissible for the further reason that it is a part of the conversation which was first offered by the defendant herself. * * * The facts contained in the dying declaration were gathered from the conversation concerning which the defendant offered a part." It would be competent for such a purpose only if it was a dying declaration when the solemnity of the occasion is a substitute for an oath.

Evidence was received that defendant, several years before the transaction for which she has been convicted, was forcibly restrained from stabbing a woman; that during the struggle she did cut the fingers of those who were restraining her. Other witnesses told of bursts of temper wherein she pulled the hair of one woman and threw beer on another, and threw the salt shakers out of the window. That she remarked when in a passion, that " she kept the knives in good repair." Much other evidence of this character was introduced. The former wife of the deceased was permitted, over objection, to tell of his philanderings with defendant before the witness divorced him, and finally she was asked by the district attorney, " I now ask you if his relations with Clara Smith was not the main contributing cause for the differences between you and your husband Howard Rhoades," to which the witness was permitted to answer, " It was." Evidence which tends to prove defendant guilty of a crime or crimes not charged in the indictment is incompetent. The evidence here received does not come within any of the exceptions to this general rule. (*People* v. *Molineux*, 168 N. Y. 264; *People* v. *Pettanza*, 207 id. 560; *People* v. *Moran*, 246 id. 100.) In so far as it tends to prove defendant's murderous and vicious propensities, it is incompetent. Character is never an issue in a criminal prosecution unless the defendant chooses to make it an issue by first giving or having given on his behalf evidence as to good character. Evidence of viciousness on the part of the deceased, the victim of the homicide, is admissible under certain conditions, but it never is admissible as against a defendant. (*People* v. *Zackowitz*, 254 N. Y. 192.) The recital of separate incidents is not the proper method to prove bad character. Each item of proof of the general character indicated in this paragraph was prejudicial.

That the judgment of conviction must be reversed is plain. It only remains for the court to decide between a new trial and a dis missal of the indictment. A new trial should be ordered if in the interest of justice. The public is interested that crimes be prevented, those guilty thereof punished and that society be orderly. The defendant has rights, and these must be considered. She may not be tried for a crime other than as charged in the indictment.

She may be placed in jeopardy only once for the same offense. A new trial should be had if, upon the competent evidence received or offered upon the first trial, a jury would be justified in finding the defendant guilty. A new trial should not be ordered if a verdict of guilty upon the second trial would be reversed.

Defendant and decedent led an unconventional and abandoned life together. Each was addicted to the use of intoxicants, and when intoxicated apparently lost all poise possessed when sober. The knife with which the wound was inflicted was an implement used at the bar, equally available to either. Affection of a sort existed between them. He refused to say that his wound was inflicted by the defendant. When the necessity for an operation was indicated, his consent could not be obtained until she came and urged it. Neither intent nor motive has been established. Defendant's fits of jealousy do not indicate a motive; they might be viewed as an explanation for her act if indeed she did inflict the wound. It was received when only the defendant and the decedent were present. That she inflicted it may be a fact — that he received it while falling down stairs having a knife in his hand is not beyond the realm of reasonable possibility. The evidence is wholly circumstantial. Where a conviction rests wholly upon circumstantial evidence, it is necessary that there shall be positive proof of the facts from which the inference of guilt is to be drawn, and that the inference of guilt must be the only inference which can be drawn reasonably from these facts. (*People* v. *Harris*, 136 N. Y. 423; *People* v. *Giordano*, 213 id. 575.)

The judgment of conviction should be reversed and indictment dismissed.

RHODES, CRAPSER, BLISS and HEFFERNAN, JJ., concur.

Judgment of conviction reversed and indictment dismissed.