THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JAMES EMERSON HALL, Appellant.

Third Department, October 31, 1940.

*Frederick S. Holbrook*, for the appellant.

*Norman G. Stagg, District Attorney*, for the respondent.

BLISS, J. On October 17, 1930, Ralph McArthur was shot five times in the head and neck with a .32 calibre revolver as a result of which he died in the Memorial Hospital at Ithaca at about two A. M. October 18, 1930. The shooting took place at a gasoline station operated by McArthur on the Ithaca-Cortland highway about three and one-half miles from Ithaca. After the shooting McArthur made his way to his home, which was on the opposite side of the highway about 100 paces to the south. There he attracted the attention of his wife and son and when the front door was unlocked he staggered in, wounded very badly. The wife testified that she and the son helped him to a chair and asked him what had happened. After he dropped into the chair he said: " Did the stove blow up or did that man shoot me? " and then immediately afterward he said, " that man shot me, he shot me

twice." They questioned him further and he said that it was the man who had been hanging around the gas station for about the last night or two. The son's version of the occurrence at the home is substantially the same as that of his mother except that he did not state that his father was asked what happened before he questioned whether he was shot or the stove blew up. These statements by the deceased were received in evidence, although the trial court immediately thereafter advised the jury that it was for them to say whether the statements were made as exclamations and involuntarily and that if they found them to have been so made, then they might consider them as part of the *res gestæ* in the case.

Later that same evening the deceased was taken to the Memorial Hospital at Ithaca and there, while on the operating table just before the administration of the anesthetic, a State trooper asked him who did the shooting and he replied, " a fellow who had been hanging around the gas station for two or three nights," and also in answer to further questioning, he made statements which pointed to the appellant as the one who had done the shooting. These statements were received over appellant's objection as dying declarations. To support the People's contention that the deceased then knew that he was dying, the physician who was attending him at the time described his condition as bad, with considerable shock and said that after he was put under the anesthetic he never recovered consciousness. He was then permitted over objection to testify that he could state with reasonable certainty as to whether or not McArthur had knowledge of the condition he was in at that time and whether or not he felt he would die, and that in his opinion he believed the man knew he was dying.

Aside from the foregoing statements made by the deceased as to the identity of his assailant, there is little evidence to connect the appellant with the crime and the jury must of necessity have relied upon these statements in rendering their verdict. Without the statements of the deceased appellant's guilt was not proven beyond a reasonable doubt. The case of the People must, therefore, stand or fall upon the admissibility of the statements of the deceased.

So much has been written upon the subject of the *res gestæ* exception to the hearsay rule that an extended analysis of it would be out of place here. We shall limit ourselves to a few brief citations. Judge EARL, in *Waldele* v. *N. Y. C. & H. R. R. R. Co.* (95 N. Y. 274), wrote as follows: " The claim that the declarations can be treated as part of the *res gestæ* is not supported by authority in this State. The *res gestæ*, speaking generally, was the accident.

These declarations were no part of that — were not made at the same time, or so nearly contemporaneous with it as to characterize it, or throw any light upon it. They are purely narrative, giving an account of a transaction not partly past, but wholly past and completed. They depend for their truth wholly upon the accuracy and reliability of the deceased, and the veracity of the witness who testified to them. Nothing was then transpiring or evident to any witness which could confirm the declarations or by which upon cross-examination of the witness testifying, or by the examination of other witnesses, the truth of the declarations could be tested. * * * Suppose the intestate had been found at that point with a mortal wound freshly inflicted by some person; and he had charged that an individual, naming him, had thirty minutes before caused the wound; would that declaration have been competent upon the trial of the person thus charged with the murder? Clearly not, within principles laid down in the cases which I have cited. Suppose in this case the person had been found there with a wound upon his head; and he had stated that the engineer upon one of these engines had struck him, as the engine passed, and the engineer had been upon trial for the offense; would the declaration have been competent? It makes no difference that the intestate had died, and could not therefore be called as a witness. If these declarations were competent, they would have been no less competent if he had survived and brought the action himself, and had been a witness upon the trial."

Again, in *People* v. *Sprague* (217 N. Y. 373), Judge COLLIN wrote: " The error in admitting testimony was this: Two witnesses in behalf of the People were permitted to testify that the deceased when he reached the doorway of his home, after he was shot, in answer to the question 'What is the matter?' stated, 'Charley Sprague has shot me.' The appellant's counsel made proper objection to the questions which called forth the statement, and exception to the ruling admitting them. It is the law that the admission in evidence of the declaration of an injured person concerning the cause or manner of the injury is an exception to the general rule that hearsay evidence is inadmissible, and should occur only when the declaration is so spontaneous or natural that the truthfulness of the declarant in making it is apparent. As Judge GRAY wrote: 'the distinction to be made (between an admissible and inadmissible declaration) is in the character of the declaration; whether it be so spontaneous, or natural, an utterance as to exclude the idea of fabrication; or whether it be in the nature of a narrative of what had occurred. In the present case, the declaration of the deceased was not spontaneous; it was called forth by the inquiry as to 'what had happened' and was, distinctly,

narrative.' (*Greener* v. *General Electric Co.*, 209 N. Y. 135, 138.) In the case we are now considering the declaration was not so spontaneous or natural as to exclude the idea that it was the outgrowth of the threat made to the deceased by the appellant that he would get a gun and shoot him, or the idea that the deceased fabricated it. The space of time between the shooting and the declaration was considerable. The distance traveled by the deceased in going to the doorway, where the declaration was made, from where he was when shot, was substantial. The declaration was called forth by the inquiry: 'What is the matter?' and was distinctly narrative. The declaration made under such conditions was wholly untrustworthy and should not have been received."

These are typical of many judicial utterances on this subject. Under them it is obvious that the statements made by the deceased at his home some distance from and some time after the shooting were improperly received. They lack that close proximity in time and space, as well as the spontaneity required of such utterances as a substitute for the oath of the witness in open court. The formal dignity of the judicial scene and the opportunity for cross-examination, both of which impel strongly to adherence to the truth are also lacking. The courts on many occasions have elucidated the rule as to dying declarations and we shall not yield to the temptation to repeat them. (See *People* v. *Ricken*, 242 App. Div. 106, and cases there cited.) As in the case of the so-called *res gestæ* declarations of the deceased, here again we fail to find sufficient foundation for their reception. There was no statement or indication by the deceased himself that he knew the heavy hand of death was upon him or that his final moment had come which give to last words the solemnity of an oath. Nor do we believe that it was competent for the attending physician to give his own opinion as to the knowledge of deceased on this subject. There was no necessity for it. It was for the jury to say whether the deceased knew he was dying and there was no need for expert assistance on this subject. With all the facts before them they could pass upon this question without difficulty. (*Bogart* v. *City of New York*, 200 N. Y. 379.) Aside from the doctor's expression of opinion, there was insufficient proof to warrant the conclusion that deceased knew he was dying.

These two errors in the reception of evidence were obviously highly prejudicial to the appellant and require a reversal of the judgment. Without this evidence there would have been no case to submit to the jury. The judgment of the Trial Term must, therefore, be reversed upon the law and the indictment dismissed.

HILL, P. J., CRAPSER, HEFFERNAN and FOSTER, JJ., concur.

Judgment of conviction reversed upon the law and indictment dismissed.