## STATE v. PROCTOR.

### No. 43765.

Supreme Court of Missouri.

Division No. 1.

June 14, 1954.

Motion for Rehearing or to Transfer to Court en Banc Denied July 12, 1954.

Lawrence J. McKin and Samuel J. Kevrick, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Julian L. O'Malley, Asst. Atty. Gen., for respondent.

COIL, Commissioner.

Defendant, who shot and killed Blanchie Warren, was convicted of second degree murder and sentenced to 35 years in the penitentiary. He contends that the trial court erred in refusing to admit in evidence an alleged dying declaration.

On October 5, 1952, six persons were in Louise Wallace's apartment; some of them had been there since 9 a. m. and others had arrived at various times thereafter. They, other than deceased, had been drinking whiskey and gin, but the evidence tends to show that no one was intoxicated. About one o'clock deceased, Blanchie Warren, who had been there before for a brief time returned and joined in an argument which was in progress between defendant and

Louise Wallace. Those present described the events immediately preceding the shooting in various ways. Suffice, for our purposes, to state that Louise Wallace went to a closet from which she took a pistol and, either a scuffle ensued among her, defendant, and deceased, or defendant simply jerked the pistol from Louise's hand. In any event, all of the state's witnesses who testified on the subject stated that at the time the fatal shot was fired, defendant was standing at least 3½' or 4' from deceased and that the scuffle, if any, had terminated well before the shot was fired. Deceased fell to the floor immediately. One of the witnesses spoke to her between the time she fell and the time the police arrived a few minutes later. This witness said, "I asked her—we all call her Ducky— I said, 'Ducky, you dead?' And she said, 'Mmhmm.'" A police officer testified that when he arrived, shortly after the shooting, deceased was lying on the floor and bleeding from a wound in her neck; that she told him that she "was suffering from a pain in her neck" and that she was not able to move "the lower extremities of her body or her arms"; but that deceased said nothing as to whether she expected to live or die. Deceased was placed in the ambulance section of a cruising patrol car and conveyed to a hospital. On the way, she said to a police officer in the car that "she was called to her aunt's home at that address, and when we arrived there the aunt, who was Louise Wallace, and her common-law husband Proctor were involved in an argument. She inquired what the nature of the argument was and her aunt told her they were arguing about Proctor's legal wife coming there, and during the argument the aunt, Louise Wallace, got the pistol from the closet in the living room and she and Proctor tried to get the gun away from her and during the scuffle the gun was accidentally discharged." Deceased said nothing at that time to indicate her mental state as to her consciousness of impending death.

Upon arrival at the hospital, deceased was first seen by Dr. Adams, apparently in the emergency receiving room. He said, "there was a gunshot wound of the neck

* * * I thought there was some involvement of the trachea, I had her rushed right up to female surgery so she could go to the operating room as soon as possible." Dr. Davis, who was one of the doctors who attended deceased from the time she entered the hospital until she died on October 13, said the bullet had entered the neck and exited in the region of the upper quarter of the right scapula; that there was damage to her spinal cord and there was blood in the pleural cavities; that she was unable to talk during the entire time she lingered; that a traecheotomy was performed so she could breathe; that she was in a serious condition from the time she entered the hospital; that she was paralyzed from the neck down; that such paralysis could have occurred immediately when the bullet struck the spinal cord. Dr. Davis testified, without objection, that "I didn't hear anyone or didn't advise her as to how serious she was, although I do believe that she was aware of her condition. Q. You do believe she was aware of the seriousness of her condition? A. I do. Q. And that she could die at any time as a result of it? A. Yes."

The trial court excluded in whole and in part the statement made to the police officer above quoted on the ground that it was not shown that the statement was made by the declarant under a consciousness of impending death and after hope of recovery had been abandoned, and on the further ground that the statement that the gun was accidentally discharged was a conclusion which the witness, if alive and on the witness stand, would not be permitted to state.

█ A statement to be admissible as a dying declaration must have been made by the declarant in extremis and in the belief of impending death after hope of recovery has been abandoned. State v. Strawther, 342 Mo. 618, 624, 116 S.W.2d 133, 136[2, 3]. The declaration may be in narrative or question and answer form; and it is the impression of almost immediate death and not the rapid succession of death in fact which renders a declaration admis-

sible. State v. Kelleher, 201 Mo. 614, 637, 638, 100 S.W. 470, 477. An explanatory statement by the declarant as to the presence of a sense of impending death need not be made in express language. It is sufficient if the sense of impending death and the abandonment of hope of recovery appears by any means. The despair of recovery may be inferred from the circumstances if the facts in evidence support the inference. "The surrounding circumstances may, and frequently do, speak as loudly as the oral word. It is enough if, from all the circumstances, it satisfactorily appears that such was the condition of the declarant's mind at the time of the declarations. The declarant's belief in imminent death may be inferred from the nature of his condition, his evident danger, the character of his injury, the administration of the last rites of the church, the conduct of the declarant, and other circumstances which indicate his apprehension of imminent death." 26 Am.Jur., Homicide, § 420, p. 447; State v. Evans, 124 Mo. 397, 409, 28 S.W. 8, 11; State v. Anderson, Mo.Sup., 34 S.W.2d 25, 26[2–5]; State v. Kelleher, supra.

■ Whether a statement has been made when declarant was conscious of impending death and after he had abandoned hope of recovery is a question to be determined by the trial court at a preliminary hearing. State v. Custer, 336 Mo. 514, 517[1], 80 S.W.2d 176, 177[1, 2]. However, after the trial court has determined on preliminary hearing "the character of the statements as dying declarations * * * for the purpose of determining their admissibility," the ruling of the trial court that the statement is admissible does not have "the effect of precluding consideration by the jury of the question of declarant's belief when he made the statements * * *." State v. Custer, supra, 80 S.W.2d 180. The Custer case established the rule in this state that whether a certain statement is in fact a dying declaration is a question for the jury under proper instructions from the court, even though the trial court has so determined on preliminary hearing. The Custer case overruled prior Missouri decisions holding that a trial court's preliminary determination that a certain statement was a dying declaration was conclusive.

■ Dying declarations are admissible in favor of the defendant as well as against him. State v. Livingston, Mo.Sup., 204 S.W. 262, 263[2]. Usually, however, the question in an appellate court is whether the trial court erred in admitting an alleged dying declaration offered by the state. And it may often be that this hearsay testimony is the only evidence connecting a defendant with the crime charged. Thus, because it is hearsay and its admission may be the determinative factor in depriving one of his life or liberty, trial courts, and appellate courts on review, must be "exceedingly careful that there should be a rigid adherence to the principles upon which, and the preservation of the constituent elements from which," statements are admitted as dying declarations. State v. Johnson, 118 Mo. 491, 501, 24 S.W. 229, 231. It is important then, that a jury not even hear the contents of a purported dying declaration unless the party offering it has shown on preliminary hearing by substantial evidence of clear probative value that the alleged statement was made under a consciousness of impending death and after hope of recovery had been abandoned.

Before deciding whether there was sufficient evidence adduced in the instant case to have required the trial court to have submitted to the jury whether deceased's statement to the police officer was in fact a dying declaration, we should first determine whether the opinion of Dr. Davis (that deceased was aware of the seriousness of her condition and aware of the fact that that condition could result in her death at any time) has any probative value as evidence. We find no Missouri case on the question except State v. Anderson, supra. There, the court discussed the testimony of a doctor who had related what had been said to him by deceased. In holding that the statement was admissible as a dying declaration, against the objection that it was not shown that declarant expected immediate dissolution, the court said at 34

628

S.W.2d 26: "Dr. McRaven, of course, could not give his opinion as to what he thought she believed about it, but his story indicates that she knew she was going to die." That statement was obviously dictum in that case. Dr. McRaven had not given his opinion as to the state of mind of de-clarant and the question was thus not before the court for decision.

There is a division of authority in the various jurisdictions on this proposition. In 40 C.J.S., Homicide, § 295, p. 1266, this statement is made: "Testimony that deceased realized he was mortally wounded, or that deceased knew he was going to die, the witness not being cross-examined as to the basis for this statement, or the opinion of a witness who has had full opportunity for reaching a correct conclusion that deceased was aware of impending dissolution, has been held sufficient. However, it has been held, on the other hand, that the declarant's belief that death was impending could not be shown by the bare conclusion of the witness that declarant knew he was going to die in a short time, * * *."

In Pennington v. State, 136 Tenn. 533, 539, 190 S.W. 546, 547[4], the court said: "It is further insisted that the court erred in permitting Miss Sharp to testify that deceased realized he was going to die. This assignment of error is not well taken. There is abundant authority to the effect that a witness who remains with the deceased a considerable time before his death, hears him talk, witnesses his demeanor, and has full opportunity for reaching a correct conclusion, may testify to the opinion, or conclusion formed from such circumstances, that the deceased was aware of impending dissolution.

"The Supreme Court of California says that such an expression of such a witness is not a mere opinion of the witness in the objectionable sense. 'It approaches to knowledge, and is knowledge, so far as the imperfection of human nature will permit knowledge of these things to be acquired; and the result thus acquired should be communicated to the jury, because they have not had the opportunities of personal observation, and because in no other way can they effectually have the benefit of the knowledge gained by the observations of others.' People v. Sanford, 43 Cal. 29." To the same effect, see: Plummer v. State, 200 Ga. 641, 38 S.E.2d 411, 413; State v. Mooney, 185 Wash. 681, 56 P.2d 722, 723[2].

Among the cases holding that a physician's opinion as to whether deceased knew he was dying is not competent, see: People v. Smith, 245 App.Div. 69, 71, 281 N.Y.S. 294, 298[1–7]; People v. Hall, 260 App.Div. 421, 424, 22 N.Y.S.2d 973, 976 [1–3]; and State v. Layton, 204 N.C. 704, 706, 169 S.E. 650, 651.

It would have been desirable for counsel to have inquired into the reasons for Dr. Davis' opinion and to have established when, in point of time with relation to the time of the alleged dying declaration, it was the doctor's opinion that deceased realized she could die at any time as a result of her injury. Nevertheless, we think that the opinion of a doctor who had been in a position to have acquired knowledge upon which to base such an opinion is of some benefit to a jury, along with all the other facts and circumstances in evidence, in determining whether a statement was in fact a dying declaration. As we have noted, there was no objection to Dr. Davis' testimony. But inasmuch as the case will be remanded for retrial, we may observe that unless further examination of the doctor discloses that he possessed insufficient knowledge upon which to base such an opinion or that his opinion of deceased's realization of impending death did not apply to the time of deceased's statement, his opinion would be admissible.

Was there evidence sufficiently cogent to have required the trial court to submit to the jury the ultimate fact of whether the deceased's statement to the police officer was a dying declaration? From the recitation of the pertinent evidence heretofore made, it appears that, a very short time before making the statement, deceased had suffered a gunshot wound through the

neck; that she was prone on the floor and was suffering from the bleeding wound; that she was paralyzed, probably from her neck down; that she was asked whether she was dead, to which she replied "Mmhmm"; that a very short time thereafter she made the statement in question; that she was in a serious condition when she entered the hospital and remained in that condition until her death, with the paralysis which probably occurred when the bullet struck the spinal cord remaining in effect.

■ Deceased's answer "Mmhmm" should be interpreted in the light of all the circumstances and in the light of deceased's condition at the time the answer was made. The trial court took the view that "Mmhmm" was equivalent to "Yes" and that, therefore, the only effect of the answer was to conclusively demonstrate that such answer was not true. However, while it may be that the answer was subject to more than one interpretation, nevertheless, when it is considered in the light of all the circumstances and in the light of deceased's obvious physical condition when the answer was made, we cannot escape the conclusion that the thought deceased expressed when she said in effect "Yes, I am dead" was that she realized or believed that she was then in the process of dying. And we find nothing in the evidence which would warrant the conclusion that deceased's state of mind and physical condition were not the same a few minutes later when she made the statement to the police officer.

In State v. Elkins, 101 Mo. 344, 350, 14 S.W. 116, 117, it was said: "The inquiry made by deceased of Coughran, namely, 'if I thought he would get well,' taken by itself, would lead to the conclusion that he had not then given up all hope; but he stated repeatedly that he was killed, and told those present 'not to take on.' To Mr. Coughran he said, 'For God's sake, don't take it up!' The deceased was mortally wounded; and, taking his statements as a whole, it is clear that he was conscious of that fact. It is impossible to escape the conclusion that he expected to die from the wound, and that he had abandoned all hope; and, this being so, it follows that his statements were admissible on the ground of dying declarations."

In State v. Custer, supra, this court said at 80 S.W.2d 178[3]: "In the instant case the state's evidence was that deceased fell when he was shot and had to be carried to his home. When the doctor arrived, he was suffering severely and was in a very bad condition. The doctor's ministrations failed to relieve his suffering, as witness the statement to Tuttle that he was then still suffering greatly. His expression: 'He got me; I am all in,' must be interpreted in the light of the circumstances and his condition at the time the words were spoken. While the evidence offered in this case as foundation for the admission of the dying declaration does not seem to us quite as strong as in the cases above cited [State v. Kelleher, supra, and State v. Dipley, 242 Mo. 461, 147 S.W. 111, 114] and others which we have examined, we are inclined to think it was sufficient to justify admission of the declaration in evidence." (Bracketed insertion the present writer's.)

In State v. Livingston, supra, deceased was shot through the skull on September 21 and lived until October 9. A deputy sheriff testified that while deceased was in the hospital he had this conversation with him: "'I am the prosecuting attorney, and this is the deputy sheriff, Mr. Bridges. We came out here to learn what we could about this shooting. Do you realize that you are going to die?' and that Livingston answered, 'Yes, I guess I will;' and that Livingston then said to them, 'I shot myself;' and that on being asked why he had shot himself he answered, 'I was disgusted.' That evidence was offered as a dying statement, and was excluded." 204 S.W. at page 263. The court pointed out that there was no evidence that a physician or any other person had told deceased that there was no hope for him, and then stated, 204 S.W. at page 263: "It must be conceded that the word 'guess' is not very definite or emphatic. In State v. Dipley, 242 Mo. 461,

147 S.W. 111, the injured person was not told that he would die. He said that he could tell from his breathing that he was shot through the lung, and repeatedly stated, 'I guess they have got me.' It was held that a declaration made by him under such circumstances was admissible as a dying declaration. That declaration was admissible not so much because the injured person said, 'I guess they have got me,' but because he was shot through the lungs and knew it.

"The thing that almost staggers belief in this case is that, though Livingston was shot through the brain, he not only lived for more than two weeks, but was conscious for some days after being shot. Being conscious, he must have known that the physicians were treating him for a bullet wound in the brain.

"* * * We insist that no stronger case than this is likely to arise for the enforcement of the rule announced by the Supreme Court of the United States in the Mattox Case, supra, [Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917] where it was said that the sense of impending death may be made to appear from what the injured person said, 'or from the nature and extent of the wounds inflicted, being obviously such that he must have felt or known that he could no[t] survive.' "

■ Tested by the decisions in the foregoing cases, realizing that since State v. Custer, supra, the jury decides again the fact issue as to whether a statement was or was not made under a sense of impending death and after hope of recovery had been abandoned, and resolving any doubt in favor of the defendant, we are of the opinion that a sufficient foundation was laid to require the trial court to submit the statement to the jury for its determination as to whether it was in fact a dying declaration and, if so, to give to it whatever weight the jury thought proper. This, unless the trial court correctly excluded the statement for another reason.

■ As noted, the trial court excluded the statement on the additional ground that it was a conclusion which deceased would not have been permitted to state had she lived and was being examined as a witness. Matters of opinion in dying declarations are inadmissible unless they would have been received in evidence if the declarant himself were a witness; but what constitutes a statement of opinion or a statement of fact depends not alone upon the statement itself but upon the surrounding circumstances as well. State v. Strawther, supra, 116 S.W.2d 137, 138. No part of the instant statement was a conclusion with the exception of deceased's characterization of the discharge of the gun as "accidental." In our view, this statement, standing alone and unexplained, would be objectionable as a conclusion and inadmissible. However, when taken in its context we are inclined to the view that the part of deceased's statement that the gun was "accidentally discharged" was a statement of her opinion drawn from facts immediately under her observation and was not objectionable as a conclusion. State v. Wilks, 278 Mo. 481, 490, 213 S.W. 118, 121. The declarant characterized the discharge of the gun as "accidental" to express her purported knowledge that it was discharged as a result of the scuffle which ensued in attempting to get the gun away from Louise Wallace. However, inasmuch as the case is to be remanded for a new trial the word "accidentally" may be eliminated from the statement, obviating any question as to whether the statement was deceased's unwarranted conclusion. Furthermore, that part of the statement which purports to relate what the aunt told deceased should also not be admitted because it would not be admissible were the deceased herself a witness.

■ Defendant also contends that the court erred in giving instruction 2 on the subject of presumptions of intent and malice. This point was not preserved in defendant's motion for new trial and is therefore not before us for review. However, inasmuch as we are remanding the case, we call attention to the language of

the court en banc in State v. Martin, Mo. Sup., 260 S.W.2d 536, 546: "Our conclusion is that, at least in those cases where the facts are fully developed by eyewitnesses, instructions on presumptions of intent and malice, should not be given."

Reversed and remanded for a new trial.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.